COLORADO COURT OF APPEALS 2016COA159

Court of Appeals Nos. 14CA1435 & 14CA1436
Pueblo County District Court Nos. 12CR222 & 12CR27
Honorable William David Alexander, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Valerie Christine Harris,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE HARRIS
Dailey and Furman, JJ., concur

Announced November 3, 2016

Cynthia H. Coffman, Attorney General, Rebecca A. Adams, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Darol C. Biddle, Pueblo, Colorado; Darrel L. Campbell, Westminster, Colorado,
for Defendant-Appellant

¶ 1    Valerie Christine Harris was convicted of twenty-two counts of cruelty to animals after dozens of malnourished animals were discovered on her property by employees of the Humane Society acting as state animal protection agents.

¶ 2    Her appeal raises two novel issues of statutory construction: first, we consider whether, under section 35-42-107(7), C.R.S. 2016, an animal protection agent who is an employee of the Humane Society is authorized to obtain a search warrant to investigate the suspected mistreatment of horses.  We conclude that the agent exceeded her statutory authority but determine that suppression of the evidence seized in executing the warrant is not required.

¶ 3    Second, we consider the proper unit of prosecution in an animal cruelty case.  Harris contends that her mistreatment of the twenty-two animals constituted one continuous course of conduct, and the district court's entry of judgment on twenty-two counts therefore violated her rights under the Double Jeopardy Clause.  We conclude, however, that under section 18-9-202, C.R.S. 2016, cruelty to each identified animal victim constitutes a separate and distinct offense.

¶ 4     Harris raises a number of other claims, which we address in turn and reject.  Accordingly, we affirm.

## I.     Background

¶ 5     In December 2011, Harris's neighbor called animal control to report a dead horse near the fence line of his property with Harris.  Animal protection agent Sergeant Stephanie Garcia and a fellow officer, employees of the nonprofit corporation Humane Society of the Pikes Peak Region, responded to the call and discovered that the dead horse was visibly emaciated.  Using binoculars, the agents observed additional horses, a donkey, and a llama on Harris's property, all of which also appeared malnourished.

¶ 6     Based on the condition of the animals, Sergeant Garcia sought a search warrant (the horse warrant) for Harris's ranch to investigate possible animal cruelty.  During the search, conducted on January 6, the animal protection agents and accompanying law enforcement officers discovered a recently deceased donkey that, like the previously discovered deceased horse, appeared drastically underfed.  About one-third of the horses on the property similarly showed signs of starvation.

¶ 7     The officers also discovered a number of dogs showing signs of neglect: many of them appeared severely malnourished, and they did not appear to have adequate care or shelter.  However, the horse warrant only allowed the agents to search for and seize abused livestock.  Based on her observations of the dogs, Sergeant Garcia obtained a second warrant (the dog warrant) to search for and seize mistreated domestic dogs, which was executed that same day.

¶ 8     Harris was charged with fifteen counts of cruelty to animals (second offense)[1] and two counts of aggravated cruelty to animals for needlessly killing an animal (case 12CR27).

¶ 9     Approximately three weeks later, on January 27, the same neighbor who had made the initial report informed animal control that three dead horses had been dragged onto his property.  The neighbor later observed Harris and her brother attempting to drag the horses back onto her property.  Sergeant Garcia responded to the call and, after observing the three dead horses, contacted

---

[1] She was originally charged with seventeen counts of cruelty to animals, but two counts were dismissed before trial.

Harris. With Harris's permission, Sergeant Garcia entered onto her property and discovered two additional dead horses.

¶ 10    Harris was charged in a separate case with five counts of aggravated cruelty to animals for needlessly killing the five horses (case 12CR222). The two cases were later consolidated for trial.

¶ 11    At trial, the prosecution presented multiple witnesses, including an expert in veterinary medicine, who were on the property during the search. All of these witnesses testified that the animals at issue in the case appeared severely malnourished and that there was no evidence of food on the property. To demonstrate this fact, the prosecution submitted numerous pictures depicting the visibly emaciated animals.

¶ 12    Harris's theory of defense was that the horses were malnourished due to excess sulfates in the water. She insisted that she was regularly feeding her horses and justified the absence of any food on the ranch by explaining that she procured hay from a neighbor on a daily basis. In support of this defense, Harris presented evidence that a test had revealed high sulfate levels in her well water, and an expert witness who opined that this level of sulfates in the water could cause horses to be malnourished.

¶ 13     The jury convicted Harris on all counts. In a bifurcated proceeding, the court determined that the fifteen animal cruelty convictions counted as a second offense due to Harris's prior misdemeanor convictions for animal cruelty in 2007. The court sentenced Harris to concurrent ten-year terms of probation for all counts of conviction in case 12CR27. On the five aggravated animal cruelty counts in case 12CR222, the court sentenced Harris to three years in the custody of the Department of Corrections, to run concurrently to each other and to her sentences in 12CR27.

## II.     The Search Warrants

¶ 14     In the district court, Harris moved to suppress all evidence obtained from the search on the grounds that the animal protection agents were not statutorily authorized to obtain a livestock warrant and that both warrants lacked probable cause. She renews that argument on appeal.

¶ 15     We agree that the animal protection agent exceeded her statutory authority in procuring the horse warrant. However, we reject Harris's argument that the warrants were otherwise deficient because they were not supported by probable cause. Based in part on this latter determination, we conclude that the statutory

5

violation does not implicate constitutional concerns and, therefore, does not require suppression of any evidence obtained from the search. Accordingly, we affirm the trial court's denial of the motion to suppress. *See People v. Aarness*, 150 P.3d 1271, 1277 (Colo. 2006) (we may affirm the district court on any grounds supported by the record).

### A. Authority to Obtain the Horse Warrant

¶ 16 Harris contends that, although Sergeant Garcia is a peace officer under the Animal Protection Act, because she is an employee of a nonprofit organization, she was not statutorily authorized to investigate cases of cruelty to livestock.

¶ 17 The People respond that Harris raised this issue for the first time on appeal, but our review of the record establishes that Harris's counsel argued the issue at the hearing on the motion to suppress evidence.[2] Accordingly, the claim of error is preserved.

---

[2] Defense counsel stated:

> And there's no response by the People denying the limitations that are set out in the Animal Protections Act, 35-42-107, Paragraph 7, where it says, 'Agents authorized to investigate cases of livestock shall be employees of

¶ 18    Ordinarily, in reviewing the trial court's ruling on a motion to suppress evidence, we are presented with a mixed question of fact and law and apply a dual standard of review, deferring to the factual findings and reviewing legal conclusions de novo. *People v. Vaughn*, 2014 CO 71, ¶ 9. Here, Harris's contention raises an issue of statutory construction, and thus we review her claim de novo. *People v. Chavez-Barragan*, 2016 CO 16, ¶ 9.

¶ 19    Our primary duty in interpreting statutes is to give full effect to the intent of the General Assembly. *Ryan Ranch Cmty. Ass'n v. Kelley*, 2014 COA 37M, ¶ 39, *aff'd*, 2016 CO 65. To determine legislative intent, we look first to the plain language of the statute. *State v. Nieto*, 993 P.2d 493, 500 (Colo. 2000). When the language of a statute is clear, we apply the statute as written. *Id.*

¶ 20    Under section 35-42-107, the Colorado Commissioner of Agriculture may appoint animal protection agents, who are designated as peace officers. These agents may be employees of the state, nonprofit corporations, municipal corporations, counties,

division of agriculture, the brand inspector, and the sheriffs.' We don't have that here.

7

cities, cities and counties, or any other local governmental entity or political subdivision of the state. § 35-42-107(2).

¶ 21     Harris does not dispute that Sergeant Garcia was properly commissioned as an animal protection agent even though she was an employee of the Humane Society, a private nonprofit organization. She contends, though, that under section 35-42-107(7), only state employees may investigate livestock cases.

¶ 22     Subsection 107(7) specifies that "[a]gents authorized to investigate cases involving livestock shall be employees of the division or the division of brand inspection of the department or any sheriffs when appointed and within their jurisdiction." In construing this provision, we must look first to the plain language of the statute, *Nieto*, 993 P.2d at 500, which indicates that agents who investigate livestock cases "shall" be specifically designated public officials. "It is axiomatic that the term 'shall' is usually interpreted to make the provision in which it is contained mandatory." *Estate of Guido v. Exempla, Inc.*, 2012 COA 48, ¶ 25; *see also Hillebrand Constr. Co. v. Worf*, 780 P.2d 24, 25 (Colo. App. 1989) (the term "shall" connotes a mandatory requirement). Thus, under the plain language of the statute, the provision restricts the

investigation of livestock cases to employees of the Division of Agriculture, brand inspectors, and sheriffs.

¶ 23　This interpretation of the provision's plain language comports with other standards applicable to investigations involving livestock. Because livestock generally have greater economic value than companion animals, the article provides certain protections for owners of livestock. For example, livestock cannot, under any circumstances, be seized without a court order. *Compare* § 35-42-109(2)(b), C.R.S. 2016 (livestock may only be seized pursuant to a court order, even when the animal's life or health is endangered), *with* § 35-42-109(2)(a) (companion animals may be seized whenever the animal's life or health is endangered).

¶ 24　Our interpretation insures that owners of livestock have a broader remedy against agents who commit negligence or misconduct. The state may disclaim liability for the conduct of animal protection agents employed by nonprofit organizations, *see* § 35-42-107(3), but it is liable for the conduct of the designated public officials. We believe the legislature's mandate that animal protection agents who seize livestock *shall be* employees indicates

an intent that the state be accountable for the misdeeds of agents entrusted with livestock investigations.

¶ 25    The People insist that section 34-42-107(7) does not limit the animal protection agents who are authorized to investigate livestock; rather, it confers employment status on those agents. But they offer no support for this novel interpretation, and this construction does not comport with the plain language of the statute or its purpose. *See Tatum v. Basin Res., Inc.,* 141 P.3d 863, 871 (Colo. App. 2005) ("Courts may not interpolate into a statute words that it does not contain, or extract a meaning which is not expressed by it."). Accordingly, we reject this reading of the statute.

¶ 26    Thus, because Sergeant Garcia is an employee of a nonprofit corporation, she was not authorized to investigate livestock cases. And the People do not dispute that the horses at issue are livestock. Therefore, we conclude that Sergeant Garcia was not authorized to investigate Harris's suspected mistreatment of the horses or to obtain the horse warrant.

B.    Remedy for the Statutory Violation

¶ 27    Next, we must decide the appropriate remedy for this violation. Both parties assume that, if Sergeant Garcia had no authority to

10

obtain the horse warrant, the search necessarily violated Harris's Fourth Amendment right to be free from unreasonable searches and seizures. On this basis, Harris contends that the exclusionary rule applies, and thus the evidence obtained during the search should have been suppressed. The People maintain that the evidence was properly admitted under the "good faith exception" to the exclusionary rule, as codified in section 16-3-308(1), C.R.S. 2016. We reject both contentions.

¶ 28 We conclude that, although Sergeant Garcia was not authorized to obtain the horse warrant, the statutory violation did not amount to a constitutional violation. Accordingly, the exclusionary rule does not apply and the evidence was properly admitted at trial.

¶ 29 "[T]he exclusionary rule is a judicially created doctrine whose sole purpose is to deter future Fourth Amendment violations." *People v. Marko*, 2015 COA 139, ¶ 150. Violations of statutory provisions, though, are not per se violations of the Fourth Amendment. *People v. Hamilton*, 666 P.2d 152, 156 (Colo. 1983). Thus, before employing the exclusionary rule as a remedy, we must determine whether there was a constitutional violation, rather than

11

a mere statutory violation.  *See People v. Bowers*, 716 P.2d 471, 473 (Colo. 1986) ("[S]uppression of evidence is a drastic remedy and is generally confined to violations of constitutional rights."); *People v. Casillas*, 2015 COA 15, ¶ 19 ("A statutory violation does not ordinarily trigger suppression of evidence because suppression 'is designed to effectuate guarantees against deprivation of *constitutional* rights.'" (quoting *People v. McKinstry*, 843 P.2d 18, 20 (Colo. 1993))) (*cert. granted* May 16, 2016).

¶ 30      Harris contends, or rather assumes, that the horse warrant was constitutionally deficient because Sergeant Garcia was not authorized to obtain it.  But to be valid under both the United States and Colorado Constitutions, a warrant must meet three requirements: (1) it must have been issued by a neutral, disinterested magistrate; (2) those seeking the warrant must have demonstrated to the magistrate their probable cause to believe that the evidence sought would aid in a particular apprehension or conviction for a particular offense; and (3) the warrant must particularly describe the things to be seized, as well as the place to be searched.  *People v. Pacheco*, 175 P.3d 91, 94 (Colo. 2006);

*Marko,* ¶¶ 145-46; *see also Bowling v. Rector,* 584 F.3d 956, 969 (10th Cir. 2009).

¶ 31    Based on these requirements, Sergeant Garcia's acting beyond her statutory authority when she obtained the horse warrant has no bearing on the constitutionality of the warrant and related search.  *See Bowling,* 584 F.3d at 968 (warrant was constitutional even though officer acted beyond his statutory authority when he applied for it); *United States v. Freeman,* 897 F.2d 346, 348 (8th Cir. 1990) (A limited-authority officer's conduct in excess of his statutory jurisdiction is an example of "procedural violations which do not implicate the constitutional values of probable cause or description with particularity of the place to be searched and items to be seized.").  Whether or not she exceeded her statutory authority is simply unrelated to the core constitutional concerns of a neutral magistrate, probable cause, and particularity.  Indeed, this statutory violation "is not, without more, significantly relevant to our Fourth Amendment analysis."  *Bowling,* 584 F.3d at 967.

¶ 32    Accordingly, if the horse warrant procured by Sergeant Garcia, although obtained in excess of her statutory authority, meets the three requirements of a neutral magistrate, probable cause, and

particularity, there is no constitutional violation. While Harris does not contest that the first and third requirements were met, she does contend that the warrants were not supported by probable cause.

¶ 33　　An affidavit establishes probable cause if the affidavit contains "sufficient facts to warrant a person of reasonable caution to believe that contraband or evidence of criminal activity is located at the place to be searched." *People v. Miller*, 75 P.3d 1108, 1112 (Colo. 2003). In determining whether probable cause exists, a judge must look to the totality of the circumstances and make a "practical, commonsense decision" as to whether there is a fair probability that a search will reveal contraband or evidence of a crime. *People v. Scott*, 227 P.3d 894, 897 (Colo. 2010) (quoting *Pacheco*, 175 P.3d at 94). A court reviewing the validity of a search warrant does not engage in de novo review but rather examines whether the magistrate had a substantial basis for concluding that probable cause existed. *Pacheco*, 175 P.3d at 94.

¶ 34　　Here, probable cause clearly existed for the horse warrant.[3] The warrant affidavit stated that the affiant observed on Harris's

---

[3] Harris contends that this warrant stemmed from an illegal search on December 31, when the officers used binoculars to look into her

property several horses that appeared underfed because they had visible spines and pin bones, and a deceased horse that appeared malnourished because his "[r]ibs, spine, withers, loin, [and] pin bones are all visible." The affiant further stated that, as a trained animal protection officer, these observations led her to believe that the animals were not being provided with adequate sustenance. She also noted that Harris had previously been convicted of animal cruelty for neglecting livestock and domestic animals, and that there is "a long history of animal neglect" on this property, supporting the inference that the observed malnourished horses were not merely sick or old. *Cf. People v. Bustam*, 641 P.2d 968, 971-72 (Colo. 1982) (knowledge of prior criminal record, in addition to other facts, supported probable cause for warrant on new instance of the same crime).

¶ 35    Given that the crime of animal cruelty can be established by demonstrating that defendant's animals were not provided sufficient sustenance and care, these facts provide a substantial basis for the

---

pastures from a neighboring property. However, this action was not a search under the Fourth Amendment. *See People v. Oynes*, 920 P.2d 880, 883 (Colo. App. 1996) (officers did not conduct a search by looking into the defendant's brightly lit home while standing in an open field using binoculars).

judge to have found probable cause that the crime of animal cruelty was occurring on the property. Accordingly, the horse warrant was constitutionally sufficient.[4]

¶ 36     In the absence of a constitutional violation, suppression of evidence is the appropriate remedy only if the statutory violation was "willful and recurrent." *People v. Lancaster*, 2015 COA 93, ¶ 22. The record does not support a conclusion that this violation was willful and recurrent. *People v. Wolf*, 635 P.2d 213, 218 (Colo. 1981).

### III.    Unit of Prosecution in Animal Cruelty Cases

¶ 37     Harris was convicted of fifteen counts of animal cruelty (second offense) and seven counts of aggravated animal cruelty. She contends that the court violated section 18-1-408(1)(e), C.R.S. 2016, and double jeopardy principles by entering judgment and imposing sentence on each count of conviction for what amounted to a single course of conduct. We review these questions of law de

---

[4] We also reject Harris's contention that the dog warrant lacked probable cause. The affidavit detailed the poor conditions in which the dogs were found, including the lack of adequate food, shelter, and water; that they were thin; and "[o]ne dog that was emaciated was observed eating the carcass of [a] dead donkey."

novo. *See People v. Reed*, 2013 COA 113, ¶ 69 (we review district court's interpretation of sentencing statutes de novo); *People v. Arzabala*, 2012 COA 99, ¶ 19 (de novo review applies to double jeopardy claims).

¶ 38     Under section 18-1-408 — entitled "Prosecution of multiple counts for same act" — a defendant cannot be convicted of more than one offense if "[t]he offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods or instances of such conduct constitute separate offenses." § 18-1-408(1)(e).

¶ 39     The statute is designed to prevent the problem of "multiplicity" — the charging of multiple counts and the imposition of multiple punishments for the same criminal conduct. *People v. Borghesi*, 66 P.3d 93, 98 (Colo. 2003). The vice of multiplicity is that it may lead to multiple sentences for the same offense and thereby implicate double jeopardy protections. *Woellhaf v. People*, 105 P.3d 209, 214 (Colo. 2005).

¶ 40     If a defendant is simultaneously prosecuted for distinct offenses under the same statute, as Harris was here, to determine whether the defendant's rights against double jeopardy were

violated, a reviewing court must resolve (1) whether the unit of prosecution prescribed by the legislature permits the charging of multiple offenses and (2) whether the evidence in support of each offense justified the charging of multiple offenses and the imposition of multiple sentences. *See Quintano v. People*, 105 P.3d 585, 590 (Colo. 2005); *Woellhaf*, 105 P.3d at 215.

¶ 41 "Unit of prosecution" refers to the extent to which the relevant statute permits the prosecution to separate the defendant's conduct into discrete acts for purposes of prosecuting multiple offenses. *Quintano*, 105 P.3d at 590. The determination of the proper unit of prosecution in this case turns on whether we construe the statute as designed primarily to protect property interests or primarily to protect the animals themselves.

¶ 42 If we view animal cruelty as primarily an offense against property, then Harris committed a single offense by injuring or destroying the animals, much like the defendant who commits a single offense by destroying various items of personal property of another. *See, e.g.*, *People v. Feldscher*, 380 N.W.2d 50, 51-52 (Mich. Ct. App. 1985) (unit of prosecution in destruction of property case was single incident of destroying property of another person,

regardless of how many items of property were destroyed); *see also*
*People v. Harris*, 139 Cal. Rptr. 778, 786 (Cal. Ct. App. 1977)
(defendants charged with receiving various stolen items could be
convicted only of one count of receipt of stolen property).  But if we
view animal cruelty as an offense against a sentient being that the
legislature is trying to protect from needless pain and suffering,
Harris committed twenty-two separate offenses.  *See Borghesi*, 66
P.3d at 98 (armed robbery statute is designed primarily to protect
people, not property, and therefore each victim supported a
separate count of armed robbery).

¶ 43   To determine the unit of prosecution, we look to the statute.
*Arzabala*, ¶ 23.  As already explained, in construing a statute, we
must discern and effectuate the intent of the legislature based
primarily on the plain and ordinary meaning of the statutory
language.  *Id.*

¶ 44   The plain language of section 18-9-202 suggests that the unit
of prosecution is "an animal."  As relevant here, a person commits
animal cruelty if he or she "mistreats or neglects any animal . . . or,
having the charge or custody of any animal, fails to provide it with
proper food, drink, or protection from the weather consistent with

19

the species, breed, and type of animal involved." § 18-9-202(1)(a). And, under subsection (1)(b) a person commits aggravated cruelty to animals if he or she "knowingly tortures, needlessly mutilates, or needlessly kills an animal." The phrases "any animal" and "an animal" suggest that a person commits a separate offense for each animal that is mistreated or neglected, deprived of adequate sustenance, or killed. *See Borghesi*, 66 P.3d at 98 (robbery statute's reference to a singular victim suggests that the legislature intended to create a separate offense for each person against whom the defendant uses force and intimidation).

¶ 45    Moreover, whether conduct constitutes an offense is dependent upon the particular species, breed, or type of animal involved in the criminal act. This provision emphasizes that the specific mistreated animal is the subject of the offense.

¶ 46    Importantly, in prohibiting the killing or abuse of "any" or "an" animal, the statute makes clear that a person can be charged with mistreating his own animal or a stray animal, demonstrating that property law principles do not underlie the statute's purpose. And we note that the statutes appear in the section of criminal laws

20

devoted to "offenses against public peace, order, and decency" rather than the section involving "crimes against property."

¶ 47    In our view, the language of the statute demonstrates that the legislature perceived animal cruelty not as an offense against property but as an offense against the individual animal.

¶ 48    This interpretation is consistent with the evolution of animal cruelty laws in the United States.  Animal cruelty was not a crime under common law.  *See McCausland v. People*, 58 Colo. 303, 305, 145 P. 685, 686 (1914).  Early animal cruelty laws were designed to protect the property interests of owners and did not restrict what an owner could do to his or her own animals.  *See* David Favre, *Living Property: A New Status for Animals Within The Legal System*, 93 Marq. L. Rev. 1021, 1027 (2010).[5]

¶ 49    But by the end of the nineteenth century, many states had enacted laws that reflected society's acceptance of the idea that animals had an inherent right to be free from unnecessary pain and suffering and that the legal system should recognize that right.

---

[5] An 1846 Vermont law, for example, made it unlawful for a person to "wil[l]fully and maliciously kill, wound, maim or disfigure any horse, or horses, or horse kind, cattle, sheep, or swine, *of another person*."  Act of Oct. 23, 1846, no. 34, § 2, 1846 Vt. Acts & Resolves 35 (emphasis added).

*See, e.g., Grise v. State*, 37 Ark. 456, 456, 459 (1881) (Statute making it unlawful to needlessly mutilate or kill "any living creature" was enacted to "protect some abstract rights in all that animate creation . . . from the largest and noblest to the smallest and most insignificant."); *Stephens v. State*, 3 So. 458, 458 (Miss. 1888) (Statute making it unlawful for person to abuse certain animals, "whether they belong to himself or another," is "for the benefit of animals, as creatures capable of feeling and suffering, and it was intended to protect them from cruelty, without reference to their being property.").[6]

¶ 50    Colorado enacted such a statute in 1889; the supreme court determined that the law precluded members of a country club from trapping, then releasing and shooting, doves for their amusement. *See Waters v. People*, 23 Colo. 33, 46 P. 112 (1896).  The court observed that animal cruelty laws had evolved as society gained a greater understanding of animals' capacity for pain and suffering:

---

[6] *Grise v. State*, 37 Ark. 456 (1881), was still a sign of its times: the court cautioned against construing the statute to lead to absurd results, like punishing a person for such petty offenses as "impal[ing] a butterfly" or "drown[ing] a litter of kittens."  *Id.* at 459; *see also State v. Pierce*, 7 Ala. 728, 731 (1845) (offense against animals could be prosecuted as "malicious mischief" but only if it could be proved that the animal killed was the property of another).

22

¶ 51 It is of common knowledge that within the past few years, as incident to the progress of civilization, and as the direct outgrowth of that tender solicitude for the brute creation which keeps pace with man's increased knowledge of their life and habits, laws, such as the one under consideration, have been enacted by the various states having the common object of protecting these dumb creatures from ill treatment by man. *Id.* at 35, 46 P. at 113.[7]

¶ 52 As states move away from property-law-based principles, many animal cruelty statutes now explicitly define the unit of prosecution as each animal victim. *See* Alaska Stat. § 11.61.140(b) (2016) ("Each animal that is subject to cruelty to animals . . . shall constitute a separate offense."); Ark. Code Ann. § 5-62-103 (2016) ("[E]ach alleged act . . . of cruelty to animals committed against more than one . . . animal may constitute a separate offense."); La. Stat. Ann. § 14:102.1(A)(3) (2016) ("[I]f more than one animal is subject to an act of cruel treatment . . . , each act shall constitute a separate offense."); Mont. Code Ann. § 45-8-211(2)(c) (2016)

---

[7] The statute made it a crime for any person to "torture[], torment[], . . . or needlessly mutilate[] or kill[] . . . any animal." *Waters v. People*, 23 Colo. 33, 34, 46 P. 112, 113 (1896) (quoting Mills' Ann. Stat. § 104 (1891)).

("[W]hen more than one animal is subject to cruelty to animals, each act may comprise a separate offense."); Wyo. Stat. Ann. § 6-3-203(k) (2016) ("Each animal affected by the defendant's conduct may constitute a separate count . . . under this section."); *see also* Cal. Penal Code § 597(f) (West 2016) ("[E]ach act of malicious and intentional maiming, mutilating, or torturing a separate specimen of [endangered species or protected animal] is a separate offense."); 18 Pa. Cons. Stat. § 5511(e.1) (2016) ("A person who violates this subsection on a second or subsequent occasion commits a misdemeanor of the third degree for each equine animal transported."); *State v. Helmbright*, 990 N.E.2d 154, 164 (Ohio Ct. App. 2013) (rejecting property law principles and holding that animal cruelty statute, like domestic violence law, creates a chargeable offense for each "victim of a defendant's conduct").

¶ 53 Based on the language and purpose of section 18-9-202, we join those states that have delineated the unit of prosecution in animal cruelty cases as each animal abused or killed. Accordingly, we conclude that the unit of prosecution permits the charging of multiple offenses.

24

¶ 54     Nonetheless, Harris argues that the conduct underlying her convictions was not a series of discrete and distinct criminal acts but instead a single course of conduct that resulted in the death or poor health of a number of animals.  In light of our conclusion that the unit of prosecution is an animal, we have little difficulty in further concluding that the prosecution proved twenty-two factually distinct offenses.  *See People v. Abiodun*, 111 P.3d 462, 470 (Colo. 2005) ("[F]actual distinctness is ultimately a function of the legislature's definition of the crime itself — the legislature's choice of an allowable unit of prosecution.").

¶ 55     To determine whether offenses are factually distinct, courts consider whether the acts occurred at different times and were separated by intervening events; whether there were separate volitional acts; and factors such as temporal proximity, the defendant's intent, and the number of victims.  *People v. McMinn*, 2013 COA 94, ¶ 22.

¶ 56     While Harris's conduct in mistreating the animals occurred over the same period of time and consisted of the same general acts, each of the charged offenses had a different, identifiable animal victim.  We conclude that the existence of multiple victims created

factually distinct offenses. *See People v. Grant*, 30 P.3d 667, 670 (Colo. App. 2000) (section 18-1-408(3) not applicable where offense involved multiple victims), *aff'd*, 48 P.3d 543 (Colo. 2002). And, as we have explained, the evidence supported the jury's verdict that each of the identified animals had been mistreated.

¶ 57 We therefore reject Harris's claim that her sentence violated a statutory or constitutional prohibition against multiple convictions or punishments for a single offense.

IV. Other Contentions

A. Sufficiency of the Evidence of Aggravated Cruelty to Animals

¶ 58 Harris contends that there was insufficient evidence to convict her of the seven counts of aggravated cruelty to animals for needlessly killing an animal. She insists that there was no evidence that definitively proved that the horses died from starvation, and therefore the jury could not convict her on these counts. We are not persuaded.

¶ 59 On a challenge to the sufficiency of the evidence, we review the record de novo to determine whether the evidence, viewed as a whole and in the light most favorable to the prosecution, is both "substantial and sufficient" to support the defendant's guilt beyond

a reasonable doubt.  *Dempsey v. People*, 117 P.3d 800, 807 (Colo. 2005).  In applying this test, "we must give the prosecution the benefit of every reasonable inference that might fairly be drawn from the evidence." *People v. Atencio,* 140 P.3d 73, 75 (Colo. App. 2005).  And we will not disturb the fact finder's determinations of witness credibility and the weight to be given to the evidence. *People v. McIntier,* 134 P.3d 467, 471 (Colo. App. 2005).

¶ 60    A person commits the crime of aggravated cruelty to animals if, as relevant here, she "needlessly kills an animal." § 18-9-202(1.5)(b).

¶ 61    Harris contends that there was insufficient evidence to prove that she actually killed the animals, and that they did not otherwise die of natural causes.  While we agree that there was no direct evidence that the horses died because Harris did not feed them, there was substantial circumstantial evidence from which the jury could have drawn this inference and reached this conclusion beyond a reasonable doubt.  *See People v. Medina,* 51 P.3d 1006, 1013 (Colo. App. 2001) ("[I]n determining sufficiency the law makes no distinction between direct and circumstantial evidence."), *aff'd sub nom. Mata-Medina v. People,* 71 P.3d 973 (Colo. 2003); *cf.*

*People v. Strohm*, 185 Colo. 260, 268, 523 P.2d 973, 977 (1974) (cause of death can be established by circumstantial evidence).

¶ 62    First, it is uncontroverted that the horses were malnourished. Dr. Gary Mason, who testified as an expert in veterinary medicine and veterinary pathology, tested femur bones recovered from nine deceased animals discovered during this investigation. According to Dr. Mason, all seven of the bones susceptible to testing[8] showed a loss of fat in the bone marrow. This fat loss is "the end stage of inability to acquire enough energy from the diet. . . . It's the end result of insufficient energy intake, and that fat is the last in the body to be metabolized in order to maintain life." He testified that the fat loss indicates that "[t]here is some condition which is long term in nature that's required those animals to use marrow fat to stay alive." He described the condition as a "chronic negative energy balance." While Dr. Mason could not definitively determine the cause of this chronic imbalance, he testified that it could be the result of starvation and lack of proper feeding.

---

[8] Two of the femurs submitted were too old and dried out to analyze.

28

¶ 63   In addition to the scientific evidence of malnutrition, there was considerable testimony that the animals appeared emaciated. Veterinarian Marvin Hamann, who was present during the searches, testified that the dead horse and donkey discovered on January 6 were "emaciated" and "basically skin and bones." Similarly, he testified that the additional dead horses discovered on January 27 were "completely emaciated and just essentially skin and bones."

¶ 64   Further, there was sufficient evidence from which the jury could determine that the horses were malnourished because they were not properly fed. Dr. Hamann, who testified as an expert in veterinary medicine,[9] explained that he checked the property looking for a feed source, but "[t]here was basically no feed on the property," even though one would need between seven and eight hundred pounds of hay per day to feed the number of animals found on the ranch. He further testified that there were no remnants of feed or hay, which he would expect to see if the

---

[9] The record reflects that the People moved to have Dr. Hamann qualified as an unspecified "expert"; however, the foundation for this qualification was entirely based on his veterinary practice with cattle and horses.

animals were being fed regularly.  Not only was there no feed on the property, but Dr. Hamann also testified that the ranch did not have sufficient grass on which the horses could graze.  A multitude of lay witnesses present during the January 6 search confirmed that there was little to no food on the property and echoed Dr. Hamann's observations that there were no food remnants or grass for grazing.

¶ 65    Based on these observations, Dr. Hamann concluded that the horses were "malnourished because of lack of food available."

¶ 66    Finally, there was sufficient evidence from which the jury could conclude that the horses died of malnutrition.  Dr. Hamann testified that chronic malnutrition eventually leads to death.  And Dr. Mason described the horses' bone marrow condition as the "end stage" of the animal's inability to obtain sufficient energy, and that they had to use the fat in the bone marrow to "stay alive" and "maintain life."

¶ 67    Harris maintains that because Dr. Mason could not rule out other causes of malnutrition, such as disease or toxins in the water, there was insufficient evidence to prove that her conduct caused the animals' deaths.  But the prosecution is not obliged to disprove the defendant's theories in order for the evidence to be deemed

30

sufficient under the substantial evidence test. *Clark v. People*, 232 P.3d 1287, 1292 (Colo. 2010); *see also State v. Angus*, No. 05AP-1054, 2006 WL 2474512 (Ohio Ct. App. Aug. 29, 2006) (unpublished opinion) (holding animal cruelty conviction supported by sufficient evidence where veterinarian testified that emaciated condition of animals was due to lack of food, not whipworms, as the defendant contended).  Moreover, Dr. Hamann testified that, contrary to Harris's theory of defense, there was no evidence that the horses were affected by disease or sulfates in the water; he explained that if the horses were malnourished because of water sulfates, there would have been evidence of diarrhea on the ranch, and there was none.

¶ 68    Accordingly, we conclude that a rational juror could find proof beyond a reasonable doubt that the horses died because Harris did not sufficiently feed them.

### B.    Sufficiency of the Charging Document

¶ 69    Harris argues that the charging documents filed in the two cases failed to charge an offense.  She acknowledges that the information in each case tracked the statutory language of the

31

offenses,[10] but she insists that the charging documents also had to allege the specific manner in which she killed the deceased animals; the ways in which she mistreated the other animals; and the definition of statutory terms, including "needless killing,"

[10] In 12CR27, each of the cruelty to animals offenses was charged identically, except that each count referred to a different animal by its identifying number:

> A0973012. On or about January 6, 2012, [Harris] unlawfully, knowingly, recklessly, or with criminal negligence, tormented, or deprived of necessary sustenance, or allowed to be housed in a manner that resulted in chronic or repeated serious physical harm, or having the charge or custody of an animal failed to provide it with proper food, drink, or protection from the weather consistent with the species, breed and type of animal, or otherwise mistreated or neglected, or caused or procured the mistreatment or neglect of animals, namely: canine listed above.

In 12CR222, each of the five counts of aggravated cruelty to animals was charged identically, except that each described a different animal:

> On or about January 27, 2012, [Harris] unlawfully, feloniously, and knowingly tortured, needlessly mutilated, or needlessly killed an animal, namely: a white with brown leopard spot[s] Appaloosa horse; in violation of section 18-9-202(1.5)(b), C.R.S.

32

"necessary sustenance," and "mistreated or neglected." We review the sufficiency of the indictment de novo. *McIntier*, 134 P.3d at 470.

¶ 70 A charge is sufficient if it alleges sufficient facts to permit the accused to prepare an adequate defense and to assure that the defendant cannot be prosecuted again for the same crime. *People v. Chavez*, 730 P.2d 321, 325 (Colo. 1986). To that end, if the information identifies the essential elements of the crime charged, it is sufficient. *People v. Melillo*, 25 P.3d 769, 778 (Colo. 2001). Ordinarily, an information identifies the essential elements of the crime when it tracks the statutory language. *Id.*

¶ 71 Harris's reliance on *People v. Beruman*, 638 P.2d 789 (Colo. 1982), and *People v. Donachy*, 196 Colo. 289, 586 P.2d 14 (1978), is misplaced. In *Beruman*, the defendant was charged with failing to perform a duty imposed upon him by law in connection with his job as a social services caseworker. The indictment, though, did not inform the defendant of the duties he had failed to perform, preventing him from preparing a defense to the charge. Because the mandatory legal duty was not identified, the indictment was insufficient. 638 P.2d at 794. Likewise, in *Donachy*, the public official was charged with converting public money and property to

some unauthorized use, but the indictment did not provide any further information.  The court found that the vagueness of the indictment did not sufficiently advise the defendant of the prohibited conduct.  196 Colo. at 292-93, 586 P.2d at 16-17.

¶ 72    But here, the indictment set forth the prohibited conduct — killing and mistreating specific animals by failing to provide necessary sustenance and care.  The indictment in this case was sufficient to put Harris on notice of the charges against her and to allow her to prepare an adequate defense.  *See Melillo*, 25 P.3d at 778 (information was sufficient where it tracked statutory language but did not specify how the defendant committed the crime of sexual assault on a child); *see also* § 16-5-202(3), C.R.S. 2016 ("An information may be filed using the language of the statute . . . .").

## C.    Bifurcation of Trial

¶ 73    After the trial court granted the prosecution's motion to consolidate cases 12CR27 and 12CR222, Harris filed a motion to bifurcate the trial.  She argued that evidence of her prior misdemeanor convictions, alleged in the information to support each charge of animal cruelty (second offense), would be unduly prejudicial in her trial on the substantive animal cruelty offenses.

34

Initially, the trial court denied her motion. However, on the fourth day of trial, it reconsidered its ruling and announced that the animal cruelty charges would be determined by the jury and the existence of prior convictions would be determined separately by the court. The prosecution did not present evidence of the prior convictions to the jury.

¶ 74    On appeal, Harris contends that the trial court erred by initially denying her motion for bifurcation.[11]  We review the denial of a motion to bifurcate the trial for an abuse of discretion. *See In re Marriage of Foottit,* 903 P.2d 1209, 1211 (Colo. App. 1995). A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or if its decision is based on an erroneous understanding or application of the law. *People v. Casias,* 2012 COA 117, ¶ 17.

¶ 75    Cruelty to animals is a class 1 misdemeanor; however, a second or subsequent conviction is a class 6 felony. *See* § 18-9-202(2)(b)(I).  Under this statutory scheme, the prior

---

[11] The People interpret Harris's argument as a challenge to the court's decision to consolidate the two cases. But Harris presents no argument with respect to the consolidation order and instead focuses exclusively on the alleged prejudice that flowed from the court's denial of her bifurcation motion.

conviction is a sentence enhancer rather than a substantive element of the offense. *See People v. Schreiber*, 226 P.3d 1221, 1223 (Colo. App. 2009) (prior conviction for indecent exposure was sentence enhancer, not element of offense, even though prior conviction raised offense from class 1 misdemeanor to class 6 felony).

¶ 76 Bifurcated trials are preferred in prosecutions for second or subsequent offenses when the prior convictions are alleged as a basis for imposition of a harsher sentence and are relevant only to punishment. *People v. Fullerton*, 186 Colo. 97, 99, 525 P.2d 1166, 1167 (1974). To avoid prejudice to the defendant in the initial determination of the issue of guilt, the trial court should conduct the proceedings in two stages and determine the collateral issue of enhanced punishment only after the jury has determined guilt on the substantive offense. *Id.*

¶ 77 We will assume, therefore, that the trial court abused its discretion by initially failing to grant Harris's motion to bifurcate the proceedings. But the error requires reversal under the harmless error standard only if the error substantially influenced the verdict or affected the fairness of the trial. *Hagos v. People*,

2012 CO 63, ¶ 12. The trial court ultimately agreed to the bifurcation request; still, Harris contends that the damage had been done — the trial court had read the charging document to the jury at the beginning of trial, and the document repeatedly referenced her prior misdemeanor convictions for animal cruelty.

¶ 78 We do not agree that the court's one-time reading of the information requires reversal. For one thing, there was no evidence presented that Harris had prior convictions. At the time it read the information to the jury, the court properly instructed the jurors that the information was not evidence. We generally presume that the jury understood and followed the court's instructions. *See People v. Manyik*, 2016 COA 42, ¶ 40 (although prosecutor's comments were improper, court had instructed the jury that lawyers' arguments were not evidence and the court of appeals presumes jurors followed instructions). Additionally, the weight of the evidence against Harris was significant and it is unlikely that the mere reference to prior misdemeanor convictions substantially affected the verdict. As well, the court offered to give the jury a curative instruction, which defense counsel declined. *See People v. Helms*, 2016 COA 90, ¶ 61 (denial of mistrial after introduction of prior bad

act evidence was not abuse of discretion where weight of admissible evidence was substantial and court offered to give curative instruction).  Accordingly, the trial court did not commit reversible error by initially denying Harris's bifurcation motion.

### D.    CRE 404(b) Evidence

¶ 79    Harris contends that the trial court improperly admitted evidence of other bad acts under CRE 404(b).  Harris challenges the testimony of two witnesses, Daryel McCurry and Brett Smith, both of whom testified regarding events and circumstances in 2007.[12] She contends that this testimony detailed previous misconduct and was not admitted for a proper purpose under Rule 404(b).

¶ 80    McCurry is a ranch hand who worked for Harris in the summer of 2007.  He testified that during his time on the ranch, Harris owned approximately sixty horses, a third of which were in poor condition and did not appear adequately fed.  Further, he explained that in his two months working on the ranch, there was

---

[12] In her briefs, Harris contends that the CRE 404(b) evidence relates to acts in both 2007 and 2009.  On our review of the record, however, the only testimony relating to 2009 was that horses were not seized at that time.  Further, while her opening brief purports to challenge the admission of her previous criminal convictions stemming from these incidents in 2007 and 2009, the trial court excluded all references to the convictions.

only one delivery of hay. McCurry stated that the horses fed on grass, but that there was not much grass around. During his two months on the ranch, McCurry never saw a farrier[13] or veterinarian come out to the ranch. He also testified that he was present when animal protection agents came to the ranch in 2007.

¶ 81 Officer Smith is an animal protection agent who had been involved with Harris and her ranch since 2006. He testified that, in 2007, animal protection agents seized nineteen horses from Harris's ranch, seventeen of which were in very poor condition. He also described one of the victim horses as a horse they had contemplated seizing in 2007; he explained that in 2007, the horse was thin, but only moderately so. Officer Smith also identified several of the deceased horses as horses he had seen when he was previously on the property. Finally, Officer Smith testified that Harris had large quantities of pellet feed on the property in 2007, but not in 2012.

¶ 82 The court admitted this evidence for the limited purpose of proving "opportunity, mental culpability, knowledge, identity, or absence of mistake."

---

[13] A farrier is person who trims and shoes horses' hooves.

¶ 83    Pursuant to CRE 404(b), evidence of other crimes, wrongs, or acts is inadmissible if its relevance depends on an inference that the person has a bad character and acted in conformity with that character.  However, this evidence may be admissible for other purposes.  CRE 404(b).

¶ 84    A trial court has substantial discretion to determine the admissibility of prior acts evidence, and such a determination will not be disturbed on appeal absent an abuse of that discretion. *People v. Torres*, 141 P.3d 931, 934 (Colo. App. 2006).

¶ 85    As an initial matter, much of the challenged testimony did not describe other "bad acts," which would be subject to Rule 404(b). This includes Officer Smith's testimony identifying the deceased horses as Harris's, which was a contested issue at trial; his testimony that she used pellet feed in 2007, but that feed was not found on the property in 2012; and McCurry's testimony about the condition of the ranch.  Accordingly, Rule 404(b) is inapposite to the admissibility of this testimony.  *See People v. Greenlee*, 200 P.3d 363, 368 (Colo. 2009) (stating that evidence that does not comprise "conduct, do[es] not amount to a crime, and do[es] not reveal prior bad acts" does not implicate Rule 404(b)) (footnote omitted).

¶ 86    Even if we assume that the remainder of the challenged

testimony is subject to the limitations of Rule 404(b), we conclude

that it was properly admitted.  Evidence that animal protection

agents previously seized horses in 2007, and that these horses were

in poor condition and not being fed regularly, is logically relevant to

a material fact: the evidence makes it less likely that, in 2012, the

horses were suffering from sulfate poisoning and experiencing

sudden weight loss, as Harris claimed.  *See* CRE 401; *Greenlee*, 200

P.3d at 366 (Evidence is relevant where it has "any tendency to

make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it

would be without the evidence." (quoting CRE 401)).  It also

supports the inference that Harris knew that infrequent feeding

could negatively impact the health of her horses and that she

disregarded this risk.  *See People v. Spoto*, 795 P.2d 1314, 1318

(Colo. 1990) (Rule 404(b) evidence must be logically relevant to a

material fact).

¶ 87    Additionally, the logical relevance of this evidence is

independent of the inference that Harris has a bad character, and

that she acted in conformity with this character by neglecting her

41

horses. Rather, the evidence was admitted for the proper purpose of proving Harris's mens rea; it demonstrates that Harris was aware of the potential consequences of sporadically feeding her horses, and it negates the argument that the horses were malnourished from some mistake or accident. *See* CRE 404(b) (permitting prior misconduct evidence to prove intent and absence of mistake or accident); *People v. Davis*, 218 P.3d 718, 729 (Colo. App. 2008) (Rule 404(b) evidence was properly admitted to show absence of mistake).

¶ 88    Finally, we conclude that the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice. *Spoto*, 795 P.2d at 1318. The evidence presented at trial overwhelmingly established that the animals were malnourished and not properly maintained, and the only other possible explanation for this fact was some mistake or accident (sulfate poisoning, according to Harris). So the probative value of the evidence outweighs any potential prejudice. *Cf. People v. McBride*, 228 P.3d 216, 227 (Colo. App. 2009) (probative value outweighed prejudice because prior bad acts were directly relevant to whether

the crime charged was intentional, as the prosecution contended, or accidental, as defendant claimed).

¶ 89     Accordingly, we perceive no error in the admission of the challenged evidence.

### E.     Exclusion of Photographs of Healthy Animals

¶ 90     At trial, Harris attempted to introduce, through her brother, photographs of all of the animals seized by the animal protection officers.  The trial court admitted into evidence only those photographs depicting animals that were the subject of the criminal charges.

¶ 91     On appeal, Harris contends that the trial court erred in excluding the remaining photographs.  The photographs of the nonvictim horses were relevant, she argues, because they would have established that some of the animals were in good condition, and the presence of healthy animals would have undercut the prosecution's theory that she had systematically starved the animals on her ranch.  We review the trial court's evidentiary rulings for an abuse of discretion.  *People v. Clark*, 2015 COA 44, ¶ 40.

¶ 92 We agree with Harris that the condition of the other animals on the ranch was at least marginally relevant because that evidence would tend to make the prosecution's theory that Harris did not feed her animals somewhat less probable. *See* CRE 401. And relevant evidence is generally admissible. CRE 402.

¶ 93 The court, though, did not exclude *all* evidence of the other animals' condition: Dr. Hamann conceded that approximately two-thirds of the horses on the ranch were in either good condition or moderate condition and that only a third of the horses were in very poor condition. Likewise, the expert admitted that while some horses were dehydrated, others had normal hydration. Certain of the defense witnesses also testified about the animals' condition at around the time of their seizure by the animal protection agents. That evidence was sufficient to support Harris's argument that she was not systematically starving the animals on the ranch.

¶ 94 What the court did not allow was photographs of the horses and dogs that the witnesses had already characterized as being in good or moderate health. As to that specific evidentiary ruling, we cannot say that the trial court abused its discretion.

¶ 95 Even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence. CRE 403; *People v. Salazar*, 2012 CO 20, ¶ 16. As the trial court noted, the photographs were merely cumulative of the testimony that the nonvictim animals were in generally "ok" condition. We agree that, under those circumstances, the photos of animals already deemed to be healthy or moderately healthy had no additional probative value. Accordingly, we discern no abuse of discretion in the court's exclusion of the photographs.

## F. Jury Instructions

¶ 96 Harris contends that the trial court erroneously rejected her tendered jury instructions defining various terms in the cruelty to animals statute and left the terms undefined. She insists that by failing to define the terms "needlessly killed," "proper protection from weather conditions," "proper drink," "proper food," and

"necessary sustenance," the jury was left to define its own standard of care for the animals.[14]

¶ 97    It is within the sound discretion of the trial court to determine whether additional jury instructions that properly state the law should be submitted. *People v. Esparza-Treto*, 282 P.3d 471, 480 (Colo. App. 2011).

¶ 98    When a term, word, or phrase in a jury instruction is one with which reasonable persons of common intelligence would be familiar, and its meaning is not so technical or mysterious as to create confusion in jurors' minds as to its meaning, an instruction defining it is not required. *People v. Thoro Prods. Co.*, 45 P.3d 737, 745 (Colo. App. 2001), *aff'd*, 70 P.3d 1188 (Colo. 2003).

¶ 99    Here, all of the undefined terms are common words the jury was capable of understanding, and there is no indication that the jury was confused by these terms. See People v. Allen, 657 P.2d 447, 451 (Colo. 1983) ("[T]he language of the cruelty to animals statute may be readily comprehended and applied by jurors.").

---

[14] While Harris contends that the trial court erroneously failed to instruct the jury on the definition of "otherwise mistreated," the court did instruct the jury on the statutory definition of mistreatment.

Thus, the court acted within its broad discretion when it declined to define these terms further. *See Esparza-Treto*, 282 P.3d at 480 ("When a jury indicates no confusion about the meaning of such common phrases, the trial court's failure to define such phrases specifically does not require a new trial.").

## V.    Conclusion

¶ 100    The convictions and sentences are affirmed.

JUDGE DAILEY and JUDGE FURMAN concur.