Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's
homepage at http://www.courts.state.co.us. Opinions are also
posted on the Colorado Bar Association's homepage at
http://www.cobar.org.

ADVANCE SHEET HEADNOTE
September 21, 2020

**2020 CO 75**

**No. 18SC607, *People v. Jackson*—Transferred Intent—Bad-Aim Cases—Mistaken-Identity Cases—Double Jeopardy.**

The defendant was convicted, as a complicitor, of both first degree murder and attempted first degree murder after his codefendant aimed at, shot, and killed Y.M. under the mistaken belief that Y.M. was E.O. A division of the court of appeals ruled that the Double Jeopardy Clauses of the federal and state constitutions dictate that Jackson cannot stand convicted of both offenses because the latter is a lesser included offense of the former. But in doing so, the division relied on the doctrine of transferred intent, a legal fiction that some courts use largely to ensure that a defendant doesn't escape liability in what is widely known as a bad-aim situation (i.e., *A* aims at and shoots toward *B*, but misses due to his bad aim and accidentally hits and kills *C*, an innocent bystander).

Because Colorado's broad statutory definition of first degree murder encompasses unintended victims and renders the transferred intent doctrine

unnecessary, the supreme court disapproves of the doctrine in first degree murder cases. Further, the supreme court holds that, even if the first degree murder statute didn't make the transferred intent doctrine unnecessary, the doctrine would still be irrelevant here because this is a mistaken-identity case, not a bad-aim case. Unlike a bad-aim case, where *A* aims at and shoots toward *B* but misses and kills *C* (an innocent bystander) *by accident*, in a mistaken-identity case, *A* aims at, shoots, and kills *C by mistake* (*A* hits his target, mistakenly believing that *C* is *B*). Hence, while a bad-aim case involves two victims (the person the perpetrator aimed at and shot toward and the unintended victim harmed by the bullet), a mistaken-identity case like this one involves only one victim (the person the perpetrator aimed at and shot with the intent to kill, albeit by mistake). It follows that in a mistaken-identity case, there is no need to transfer the perpetrator's intent from one victim to another — the concept of transferred intent is immaterial.

The supreme court determines that the shooter here did not attempt to kill E.O. when he aimed at and shot Y.M. Rather, in aiming at and shooting Y.M., the shooter intended and attempted to kill Y.M., the same person he actually killed. That the shooter wanted to kill E.O. and mistakenly believed Y.M. was E.O. is of no moment. Therefore, the defendant's convictions for first degree murder and attempted first degree murder are based on the same criminal conduct and relate to the same victim (Y.M.).

Accordingly, although the supreme court agrees that the trial court plainly erred in entering convictions and imposing sentences for both of the offenses in question, its rationale differs from the division's. The division's judgment is thus affirmed on other grounds. The matter is remanded with instructions to return the case to the trial court to vacate the conviction and sentence for the lesser included offense of attempted first degree murder.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

### 2020 CO 75

**Supreme Court Case No. 18SC607**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 16CA854

**Petitioner:**

The People of the State of Colorado,

**v.**

**Respondent:**

Brandon Jackson.

**Judgment Affirmed**
*en banc*
September 21, 2020

**Attorneys for Petitioner:**
Philip J. Weiser, Attorney General
Matthew S. Holman, First Assistant Attorney General
*Denver, Colorado*

**Attorneys for Respondent:**
Samler & Whitson, P.C.
Eric A. Samler
Hollis A. Whitson
*Denver, Colorado*

**JUSTICE SAMOUR** delivered the Opinion of the Court.

¶1     After deliberation and with the intent to kill, *A* aims at and shoots someone he mistakenly believes is *B* but who turns out to be *C*, and *C* dies from the gunshot wound. The question that typically arises from this factual scenario is whether *A* may be convicted of murder in the first degree after deliberation and with intent ("first degree murder") for killing *C*. Here, no one disputes that the answer to this question is "yes." Where the parties cross swords is on the issue of whether, as the People argue, *A* may *additionally* be convicted of criminal attempt to commit murder in the first degree after deliberation and with intent ("attempted first degree murder") for wanting to kill *B*. A division of the court of appeals correctly rejected the People's position on double jeopardy principles. But in doing so, it relied on the doctrine of transferred intent, a legal fiction that some courts use largely to ensure that a defendant doesn't escape liability in what is widely known as a bad-aim situation (i.e., *A* aims at and shoots toward *B*, but misses due to his bad aim and accidentally hits and kills *C*, an innocent bystander).

¶2     Because Colorado's broad statutory definition of first degree murder encompasses unintended victims and renders the transferred intent doctrine unnecessary, we now disapprove of the doctrine in first degree murder cases. Even if our first degree murder statute didn't make the transferred intent doctrine unnecessary, the doctrine would still be irrelevant here because this is a mistaken-identity case, not a bad-aim case. Unlike a bad-aim case, where *A* aims at and

shoots toward *B* but misses and kills *C* (an innocent bystander) *by accident*, in a mistaken-identity case, *A* aims at, shoots, and kills *C by mistake* (*A* hits his target, mistakenly believing that *C* is *B*). Thus, while a bad-aim case involves two victims (the person the perpetrator aimed at and shot toward and the unintended victim harmed by the bullet), a mistaken-identity case like this one involves only one victim (the person the perpetrator aimed at and shot with the intent to kill, albeit by mistake). It follows that in a mistaken-identity case, there is no need to transfer the perpetrator's intent from one victim to another—the concept of transferred intent is immaterial.

¶3     As relevant here, Brandon Jackson was convicted, as a complicitor, of both first degree murder and attempted first degree murder after his codefendant aimed at, shot, and killed Y.M. under the mistaken belief that Y.M. was E.O. We now hold that the Double Jeopardy Clauses of the federal and state constitutions dictate that Jackson may not stand convicted of both first degree murder and attempted first degree murder because the latter is a lesser included offense of the former—the elements of attempted first degree murder are a subset of the elements of first degree murder, and this particular attempted first degree murder is not factually distinct from this particular first degree murder. Contrary to the People's assertion, the shooter did not attempt to kill E.O. when he aimed at and shot Y.M. Rather, in aiming at and shooting Y.M., the shooter *intended* and

3

attempted to kill Y.M., the same person he actually killed. That the shooter *wanted* to kill E.O. and mistakenly believed Y.M. was E.O. is of no moment. Therefore, Jackson's convictions for first degree murder and attempted first degree murder are based on the same criminal conduct and relate to the same victim (Y.M.).

¶4 Accordingly, we ultimately agree with the division that the trial court plainly erred in entering convictions and imposing sentences for both of the offenses in question. But because our rationale differs from the division's, we affirm on other grounds. We remand with instructions to return the case to the trial court to vacate the conviction and sentence for attempted first degree murder.

## I. Facts and Procedural History

¶5 The charges brought against Jackson stem from longstanding animosity between two rival gangs: "Sicc Made," which is a subset of the "Crips"; and "Most Hated," which is also known as "Most Hated Gangsters." Jackson is a member and founder of Sicc Made. E.O. is a member of Most Hated.

¶6 In November 2010, members of Most Hated fired gunshots into an apartment where Jackson apparently stayed. No one was injured. A little over a year later, during the late evening of December 23 and early morning of December 24, 2011, E.O. shot Amin El-Howeris, a member of Sicc Made, while at a party. El-Howeris was injured, but survived. Approximately forty-eight hours later, on December 25, Jackson and a handful of fellow Sicc Made members met in an

4

apartment to discuss retaliating against E.O. ("the meeting"). During the meeting, El-Howeris exclaimed, "[L]ook what they did to me," and one of his associates responded, "They mess with one of us, they mess with all of us." As someone passed around a gun with a laser sight, the group discussed shooting E.O. and "finish[ing] him off." The men knew the location of the apartment where E.O. lived and were aware that he drove a gold SUV.

¶7 Jackson and his compatriots decided to go to E.O.'s apartment complex after the meeting. They traveled there in two Ford Explorers, one of which was driven by Jackson. They parked in the parking lot and waited for E.O.'s arrival.

¶8 Y.M., who was not involved with either gang, lived in the same apartment complex as E.O. He returned home from work at 3 a.m. on December 26. Y.M. drove a gold SUV similar to E.O.'s and happened to park near E.O.'s apartment. Believing that Y.M. was E.O., one of Jackson's cohorts got out of the Explorer Jackson had driven to E.O.'s apartment, walked over to Y.M.'s SUV, and shot him twice in the head, killing him instantly. When the shooter realized he had killed the wrong person, he fired numerous shots into E.O.'s apartment. No one was in the apartment at the time.

¶9 A grand jury subsequently indicted Jackson and other Sicc Made members. Jackson was charged with: (1) first degree murder (naming Y.M. as the victim); (2) attempted first degree murder (naming E.O. as the victim); (3) criminal attempt

5

to commit extreme indifference murder (naming E.O. as the victim, apparently based on the shots fired into his apartment after Y.M. was killed);[1] (4) conspiracy to commit first degree murder; and (5) accessory to the crime of first degree murder. Since Jackson was not the shooter, at trial the People relied on a complicity theory of liability and the court instructed the jury accordingly.[2]

¶10    The jury found Jackson guilty of all five charges. The trial court then sentenced him to life imprisonment without the possibility of parole on count 1, twenty-four years' imprisonment per count on counts 2, 3, and 4, and six years' imprisonment on count 5. The sentences were ordered to be served consecutively, for a total prison term of a life sentence without the possibility of parole plus seventy-eight years.

---

[1] The charge of attempted extreme indifference murder is not implicated in this appeal. The references in this opinion to the charge of (and the conviction for) attempted first degree murder all relate to count 2.

[2] Under our complicity jurisprudence, a defendant is legally accountable as a principal for behavior by another constituting a criminal offense "if he aids, abets, advises, or encourages the other person in planning or committing that offense" and does so "with: (1) the intent to aid, abet, advise, or encourage the other person in his criminal act or conduct, and (2) an awareness of circumstances attending the act or conduct he seeks to further, including a required mental state, if any, that are necessary for commission of the offense in question." *People v. Childress*, 2015 CO 65M, ¶ 34, 363 P.3d 155, 165. In this appeal, Jackson does not dispute that he is legally accountable as a principal for any conduct by the shooter that constitutes a criminal offense.

6

¶11 Jackson appealed on several grounds. *People v. Jackson*, 2018 COA 79, __ P.3d __. He argued, among other things, that his separate convictions and consecutive sentences for first degree murder (count 1) and attempted first degree murder (count 2) violated his state and federal constitutional rights against double jeopardy. *Id.* at ¶ 70. The People countered that the two separate convictions were justified because count 1 listed Y.M. as the victim while count 2 listed E.O. as the victim. However, the People agreed that a remand was necessary to direct the trial court to run the corresponding sentences concurrently. *Id.*

¶12 In a published opinion, a unanimous division of the court of appeals sided with Jackson. *Id.* at ¶ 83. Like the People, the division believed that there were two victims (Y.M. on count 1 and E.O. on count 2). *Id.* at ¶¶ 82–83. But, invoking the transferred intent doctrine, it nevertheless found a double jeopardy violation. *Id.* It then vacated Jackson's conviction and sentence for attempted first degree murder and remanded the case to the trial court for correction of the mittimus. *Id.* at ¶ 91. The division otherwise affirmed the judgment of conviction. *Id.*

¶13 Both parties timely petitioned our court for certiorari. We denied Jackson's petition but granted the People's cross-petition.[3]

---

[3] Here are the two issues on which we granted certiorari:

## II. Analysis

¶14    We begin by examining the transferred intent doctrine and determining that it has no place in first degree murder cases in Colorado given our legislature's far-reaching definition of first degree murder, which encompasses unintended victims. Next, we conclude that even if our first degree murder statute didn't render the transferred intent doctrine unnecessary, the doctrine would still be irrelevant here because this is a mistaken-identity case, not a bad-aim case. In a mistaken-identity case like this one, there is only one victim—here, Y.M., the person the shooter aimed at and shot with the intent to kill, albeit by mistake. As such, in this case, there is no need to consider transferring the shooter's intent from one victim to another.

---

1. Whether the court of appeals erred in holding that the defendant's attempted murder after deliberation conviction must be vacated where the evidence was sufficient to support it as a separate and distinct offense.

2. Whether the court of appeals erred in holding that the doctrine of transferred intent under the first degree murder statute extends to "mistaken identity" cases where such an extension is contrary to the plain language of the statute, and in concluding that the attempted murder after deliberation conviction constituted a lesser included offense of first degree murder based on its application of the transferred intent doctrine.

8

¶15 We proceed to hold that, notwithstanding the way the People charged count 2 (listing E.O. as the victim) and the arguments they advanced to the jury without objection in support of that count, as a legal matter and based on the evidence presented at trial, the victim of the attempted first degree murder was Y.M., the person the shooter aimed at and shot with the intent to kill. Because the first degree murder conviction and the attempted first degree murder conviction involved the same criminal conduct and the same victim (Y.M.), we further hold that the trial court violated Jackson's protection against double jeopardy by entering both convictions. The elements of attempted first degree murder are a subset of the elements of first degree murder, and this particular attempted first degree murder is not factually distinct from this particular first degree murder. We end by ruling that the trial court's error was plain.

## A. The Transferred Intent Doctrine Has No Place in First Degree Murder Cases in Colorado

¶16 The doctrine of transferred intent generally provides that when *A* aims at and shoots toward *B* but accidentally misses and hits *C* (an innocent bystander), *A* is just as guilty as if his aim had been precise. Wayne R. LaFave, *Substantive Criminal Law* § 6.4(d) (3d ed. 2019). Courts uniformly recognize that if *A* aims at and shoots toward *B* with murderous intent but misses because he has bad aim and ends up hitting and killing *C*, *A* is guilty of some degree of murder of *C*. *Id.* And in the majority of jurisdictions, if *A* aims at and shoots toward *B* with the

9

specific state of mind required for first degree murder, but misses due to bad aim and kills *C* instead, *A* commits first degree murder with respect to *C*. *Id.*

¶17    Such conclusions regarding criminal liability in bad-aim cases are clearly proper. *Id.* However, they are  sometimes said to rest on what has come to be known as the "transferred intent" doctrine: "To be guilty of a crime involving a harmful result to *C*, *A* must intend to do harm to *C*, but *A*'s intent to harm *B* will be transferred to *C*; thus, *A* actually did intend to harm *C*; so he is guilty of the crime against *C*." *Id.* Of course, "*A* never really intended to harm *C*." *Id.* The disciples of the transferred intent doctrine are nevertheless willing to pretend otherwise under the purely fictional notion that *A*'s intent to kill may somehow magically be transferred from *B* to *C*.

¶18    Perhaps unsurprisingly, many legal commentators widely disparage the transferred intent doctrine as a "legal fiction," with some going so far as to deride it using terms as varied as they are numerous, including "theoretically incoherent," "arbitrarily abstract," an "unexplained mystery," a "historical aberration," an "arbitrary exception to normal principles," "overly harsh," an "arrant, bare-faced" theory, a rule that has "no place in criminal law," and even as "something of a freak." Peter K. Westen, *The Significance of Transferred Intent*, 7 Crim. L. & Phil. 321, 322 (2013). And while courts seem less concerned about the fictional aspect of the doctrine, they disagree on its scope. *Id.*

10

¶19    We need not pass judgment today on whether the transferred intent

doctrine may ever be properly invoked as a theory of criminal liability.[4]  Nor do

we have to decide here whether the doctrine may ever properly serve as an

analytical tool to address a legal question in a criminal case.  Suffice it to say that

we do not approve of the division's reliance on the doctrine to resolve the double

jeopardy claim raised in this first degree murder case.  According to the division,

since "the victim killed was not the . . . intended target," the transferred intent

doctrine was "implicated by the facts of this case and provide[d] a useful

framework for resolving the legal question presented."[5]  *Jackson*, ¶¶ 84, 88.  We

disagree.

---

[4] In *Candelaria v. People*, 148 P.3d 178 (Colo. 2006), we observed that the jury had been instructed as to first degree murder "according to a theory of transferred intent," *id.* at 183, but we were quick to point out that neither the adequacy of that instruction nor the sufficiency of the evidence was before us, *id.* at 183 & n.3.

[5] For support, the division turned chiefly to *People v. Hunt*, 2016 COA 93, 412 P.3d 838, where a different division read our decision in *People v. Marcy*, 628 P.2d 69 (Colo. 1981), as establishing "that the doctrine of transferred intent applies to second degree murder." *Hunt*, ¶ 22, 412 P.3d at 843–44.  But we did not reference, let alone discuss, the transferred intent doctrine in *Marcy*.  Instead, we simply concluded, *based on the statutory language* that defined extreme indifference murder and second degree murder at the time, that there was "no requirement that the knowing conduct essential" to both offenses "be directed against the person actually killed." *Marcy*, 628 P.2d at 79.  "[A]s long as the offender knowingly act[ed] in the [statutorily] proscribed manner and cause[d] the death of another," we continued, he was "guilty of the crime even though the person killed [was] not the person against whom the criminal conduct was directed." *Id.*

11

¶20     The transferred intent doctrine is nothing more than a "round-about method" to ensure that when *A* acts with the intent to kill *B* but kills *C* instead by accident, he is considered (as he ought to be) "just as guilty as if he had actually harmed" *B*. LaFave, *supra*. Stated differently, in the criminal homicide arena, the law does not require—nor should it require—"that the defendant cause harm to the intended victim; an unintended victim will do just as well." *Id.*

¶21     In the context of first degree murder cases in Colorado, though, the concept of transferred intent is as useful as a screen door on a submarine. After all, under section 18-3-102(1)(a), C.R.S. (2019), a person commits first degree murder if, "[a]fter deliberation and *with the intent to cause the death of a person other than himself*, he causes the death *of that person or of another person*."[6] (Emphases added.) This language deems the identity of the person harmed immaterial to the issue of intent and holds a perpetrator just as liable when he kills an unintended victim as when he kills his intended victim. Such statutory language renders the transferred intent

---

[6] In Colorado, a person commits attempted first degree murder "if, acting with the kind of culpability otherwise required for commission of [the] offense [of first degree murder], he engages in conduct constituting a substantial step toward the commission of th[at] offense." *See* § 18-2-101(1), C.R.S. (2019). "A substantial step is any conduct . . . , which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense." *Id.*

doctrine unnecessary because it accomplishes directly that which the doctrine purports to accomplish indirectly via a legal fiction.

¶22    In fairness, the division consulted the language our General Assembly used in defining first degree murder.  But it inferred that such language "incorporates the doctrine of transferred intent" to hold an actor "liable for the death of an unintended victim."[7]  *Jackson*, ¶ 85 (quoting *Hunt*, ¶ 21, 412 P.3d at 843).  In other words, the division apparently reasoned that our legislature adopted a legal fiction sometimes used by courts when the statute defining the offense of first degree murder would otherwise permit a defendant to escape liability for harming an unintended victim by accident.  We prefer to view the expansive language in section 18-3-102(1)(a) as simply avoiding the need for the legal fiction altogether.[8]  Whether by design or not, our legislature's definition of first degree murder obviates any need to rely on the doctrine.

---

[7] Other divisions of the court of appeals have made similar declarations.  *See, e.g.*, *People v. Candelaria*, 107 P.3d 1080, 1091 (Colo. App. 2004), *aff'd in part and rev'd in part*, 148 P.3d 178 (Colo. 2006); *People v. Versteeg*, 165 P.3d 760, 769 (Colo. App. 2006).

[8] Even assuming for the sake of argument that, as the division surmised, section 18-3-102(1)(a) incorporates the transferred intent doctrine, that's all the more reason to simply apply the plain language of the statute without resorting to the doctrine.  What's the point of treating the statute as incorporating the doctrine if analyzing a defendant's liability for first degree murder still requires reliance on the legal fiction at the core of the doctrine?

13

## B. The Transferred Intent Doctrine Is Inapplicable Here for an Additional Reason: This Is a Mistaken-Identity Case

¶23    Even if our first degree murder statute didn't render the transferred intent doctrine unnecessary, the doctrine would still be irrelevant here because this is a mistaken-identity case, not a bad-aim case. Traditionally, application of the transferred intent doctrine has been limited to bad-aim cases. *See, e.g.*, *State v. Fekete*, 901 P.2d 708, 714 (N.M. 1995). As LaFave aptly notes, "the mistaken-identity situation . . . is governed by a quite separate set of legal rules." LaFave, *supra*.

¶24    Bad-aim cases and mistaken-identity cases are alike in that the unintended victim harmed is a surprise to the actor. *Id.* But they differ in that the surprise originates in a different deficit on the actor's part. Westen, *supra*, at 333. In the bad-aim situation, the actor harms another "by accident, that is, by lack of physical control over the direction [his] threatened harm[] will take" as it leaves his hands. *Id.* In the mistaken-identity situation, the actor harms another "by mistake, namely, by failing fully to realize who [his] . . . target [is]." *Id.*

¶25    These distinct deficits result in another critical difference between bad-aim cases and mistaken-identity cases: In a bad-aim case, there are two victims (the person the actor aims at and shoots toward and the unintended victim harmed by the bullet), but in a mistaken-identity case like this one, there is only one victim (the person the actor aims at and shoots with the intent to kill). For that reason,

14

any discussion about transferring the actor's intent from one victim to another is irrelevant in the mistaken-identity context.

¶26    Thus, if in the semi-darkness, *A* shoots with the intent to kill someone he believes is *B* but who is actually *C*, and "his well-aimed bullet kills *C*," *A* is guilty of murdering *C*, not because he intended to kill *B* and that intent is somehow transferred to *C*, but because he actually intended to kill *C*, the person he aimed at and shot with the intent to kill; in that situation, "there is even less difficulty in holding [*A*] guilty than in the bad-aim situation." LaFave, *supra*. Any argument by *A* that his mistake of fact regarding the victim's identity "somehow negatives his guilt of murder would be unavailing: his mistake does not negative his intent to kill; and on the facts as he supposes them to be *A* is just as guilty of murder as he is on the facts which actually exist." *Id.*

¶27    In a mistaken-identity first degree murder case, then, the perpetrator kills the person he aims at and shoots. As such, he kills the person he intends to kill. Transferred intent has nothing to do with it.

¶28    We are not persuaded otherwise by our century-old decision in *Ryan v. People*, 114 P. 306 (Colo. 1911), which the division used to bolster its determination regarding the applicability of the transferred intent doctrine in mistaken-identity cases. In *Ryan*, shortly after a physical encounter with two men that left him "bruised and wounded," the defendant approached the front door of his hotel

15

with a revolver in each hand and "fired five or six shots toward [a] crowd" gathered outside. *Id.* at 307. Though the two men involved in the earlier brawl were present in the crowd, they escaped unharmed. *Id.* But one of the defendant's shots hit and killed a third man, an unintended victim. *Id.*

¶29 As a preliminary matter, unlike the division, we view *Ryan* as a bad-aim or extreme indifference murder case, not a mistaken-identity case.[9] As such, it is distinguishable.

¶30 More importantly, in affirming the judgment of conviction there, we relied primarily on the statutory definition of murder in effect at the time, which cast a net wide enough to draw in the killing of an unintended victim. *Id.* at 308. We observed that "[s]ection 1624 of the Revised Statutes of 1908" stated that "murder" included the "killing 'perpetrated from a deliberate and premeditated design, unlawfully and maliciously, to effect the death of any human being *other than him who is killed.*'" *Id.* (emphasis added). Consistent with that statutory provision, we explained that "[i]f a shot is fired, without justification, with malice and deliberation, and a killing results, the homicide is first degree murder, although

---

[9] The prosecution's theory was that Ryan "was shooting at" his intended victims and missed. *Ryan*, 114 P. at 307. But the evidence "show[ed] either this to be true, or that Ryan shot indiscriminately at and toward the crowd without positive aim." *Id.*

16

the premeditation and malice were directed against one other than the person actually killed." *Id.* As well, we recited the uncontroversial rule that forms the foundation for liability vis-à-vis extreme indifference murder: When *A* shoots into a crowd with the intent "to hurt or kill any one whom he may hit," and *B* is killed, *A* "may be indicted" for *B*'s murder. *Id.* (quoting Francis Wharton, *A Treatise on Criminal Law* 489 (Wm. Draper Lewis ed., 10th ed. 1896)).

¶31   Notably, we nowhere mentioned, much less examined, the transferred intent doctrine. Given the statutory definition of murder, it was unnecessary to rely on the legal fiction that's the marrow of that doctrine. Hence, the division's transferred intent methodology in this mistaken-identity first degree murder case finds no purchase in *Ryan*.[10]

¶32   The well-reasoned opinion by the Court of Special Appeals of Maryland in *Wieland v. State*, 643 A.2d 446 (Md. Ct. Spec. App. 1994), s*uperseded by statute on*

---

[10] Admittedly, in *Ryan*, we quoted Wharton's text on homicide for the "nearly . . . universal" rule applicable when a perpetrator kills someone by mistake: "[O]ne who kills another, mistaking him for a third person . . . , is guilty or innocent of the offense charged the same as if the fatal act had killed the person" he wanted to kill. 114 P. at 308 (quoting Francis Wharton, *The Law of Homicide* 574 (Frank H. Bowlby ed., 3d ed. 1907)). But in doing so, we didn't intend to signal that the facts there implicated a mistaken-identity situation, much less that we approved of the transferred intent doctrine. Rather, we meant to simply reinforce the notion that a perpetrator cannot escape liability for murder on the ground that the person he killed was an unintended victim.

*other grounds*, Md. Code Crim. Law § 3-201(b) (2002), *as stated in Watts v. State*, 179 A.3d 929 (Md. 2018), is instructive on the reason the transferred intent doctrine is irrelevant in mistaken-identity cases. There, the appellant, who was apparently three sheets to the wind, returned home after a confrontation at a 7-Eleven. *Id.* at 448–49. He was awakened by noises outside his residence, got up, opened the front door, and shot and injured someone he believed was attempting to enter; the would-be intruder turned out to be his brother, an unintended victim. *Id.* The evidence at trial established that in one simultaneous action, the appellant opened his front door and deliberately fired away at the person standing there before realizing that it was his brother. *Id.* at 466. Rejecting the transferred intent doctrine as "totally inappropriate and immaterial" under those facts, *id.* at 467, the court spoke as follows:

> [W]ho was th[e] *intended* victim? *The intended victim was the person the appellant was shooting at, not the person he thought he was shooting at.* The intended victim, therefore, was [the appellant's brother]. That the appellant mistakenly thought his intended victim was someone other than [his brother] was of no consequence . . . . *The appellant intended to shoot the person standing outside his front door; his aim was sure; and he shot the person standing outside his front door.* His perception of the identity of the person he was shooting at was a non-issue. *Transferred intent has nothing to do with it.*

*Id.* at 466 (second, third, and fourth emphases added) (citations omitted).

¶33    The court in *Wieland* added that "[i]ntending to shoot [the appellant's brother]" required "nothing more than intending to shoot some member of the

18

species *homo sapiens* who coincidentally turn[ed] out to be [the appellant's brother]." *Id.* Because he "hit the very body he intended to hit," the court found that the appellant's intent needed "no transferring." *Id.* at 468; *see also Martinez v. State*, 844 S.W.2d 279, 282 (Tex. Ct. App. 1992) (explaining that the doctrine of transferred intent generally applies in situations where the defendant intends to shoot one person and misses, striking another by accident, but in the mistaken-identity case before it, "appellant knowingly aimed the gun at [the deceased victim], fired the gun at [him], and thereby caused [his] death"; the fact that appellant "may have believed that the victim was [someone else] [was] immaterial").

¶34    Here, notwithstanding his mistaken belief that Y.M. was E.O., the shooter is clearly liable for the first degree murder of Y.M., and the concept of transferred intent plays no part in the determination of such liability.[11] The shooter aimed at

---

[11] The division did not comment on the interrelationship between the complicity theory of liability and the transferred intent doctrine. It nevertheless referred to the transfer of Jackson's intent to kill. *Jackson*, ¶ 89. But Jackson's intent to kill was not necessarily established through proof of his complicity. *See Childress*, ¶ 33, 363 P.3d at 165 (indicating that "the intent requirement of the complicity statute does not extend to prohibited results"). We infer that the division meant to refer to the transfer of the *shooter's* intent to kill. Our focus in this opinion on the shooter's intent reflects this understanding and is consistent with the parties' implicit agreement in this appeal that Jackson is liable as a principal for any crimes committed by the shooter.

19

Y.M. and shot Y.M. As such, he shot and killed the very person he aimed at and *intended* to shoot and kill. That the shooter *wanted* to kill E.O. and mistakenly believed Y.M. was E.O. is of no consequence.

¶35 Of course, the jury convicted Jackson under a complicity theory of liability for the first degree murder of Y.M. And the validity of that conviction is not before us. The question we confront is whether double jeopardy principles preclude Jackson's additional conviction for attempted first degree murder for *wanting* to kill E.O. We tackle that question next.

## C. Double Jeopardy Prohibits Convictions for Both First Degree Murder and Attempted First Degree Murder

¶36 As we explained earlier, our General Assembly has defined first degree murder broadly so as to include unintended victims. *See* § 18-3-102(1)(a). That extensive definition applies with equal force in the context of attempted first degree murder. The question that naturally flows from the sweeping legislative pronouncement in section 18-3-102(1)(a) is why, then, do we care about who the shooter intended to kill when he aimed at and shot Y.M.? After all, whether it was Y.M. or E.O., the shooter intended to kill "another person," as that term is used in section 18-3-102(1)(a). The reason we must consider the question is that the People argue that double jeopardy principles do not require the merger of the convictions under inspection because one of them, first degree murder (count 1), involved Y.M. as the victim, while the other, attempted first degree murder (count 2),

20

involved E.O. as the victim. Before addressing the People's position, though, we pause to set forth the tenets underpinning double jeopardy.

¶37 The U.S. Constitution shields a person from being "twice put in jeopardy of life or limb" for the same offense. U.S. Const. amend. V. Similarly, the Colorado Constitution provides that a person shall not "be twice put in jeopardy for the same offense." Colo. Const. art. II, § 18. The protective umbrella of these constitutional provisions prohibits a second trial for the same offense, *Whalen v. United States*, 445 U.S. 684, 688 (1980), and "affords shelter 'against receiving multiple punishments for the same offense,'" *Waddell v. People*, 2020 CO 39, ¶ 11, 462 P.3d 1100, 1105 (quoting *Allman v. People*, 2019 CO 78, ¶ 11, 451 P.3d 826, 829). We deal here only with the protection against improper multiple punishments.

¶38 Double jeopardy tends to be implicated when multiplicity issues exist. *Woellhaf v. People*, 105 P.3d 209, 214 (Colo. 2005). Multiplicity refers to "the charging of multiple counts and the imposition of multiple punishments for the same criminal conduct." *Id.* We have said that the "vice of multiplicity" is that it may yield multiple punishments for the same offense, thereby running afoul of double jeopardy principles. *Id.* Multiple punishments do not merely encompass multiple sentences. In the double jeopardy realm, "[e]ven a conviction unaccompanied by a sentence bears sufficiently adverse collateral consequences to amount to punishment." *People v. Wood*, 2019 CO 7, ¶ 23, 433 P.3d 585, 592.

21

¶39    The mantle of protection afforded by the Double Jeopardy Clauses does not prevent the legislature from specifying multiple punishments based on the same criminal conduct. *Woellhaf*, 105 P.3d at 214. After all, the power to define criminal offenses and to prescribe the punishments to be imposed upon defendants found guilty of those offenses lies solely with the legislature. *Reyna-Abarca v. People*, 2017 CO 15, ¶ 49, 390 P.3d 816, 824. Consequently, to determine whether a punishment imposed following a conviction infringes on a defendant's double jeopardy rights, we must first examine the punishment authorized by the legislature for that conviction. *Id.* at ¶ 50, 390 P.3d at 824. If the legislature has not authorized multiple punishments, then the protection against double jeopardy prohibits the imposition of multiple punishments. *Id.* In this regard, the Double Jeopardy Clauses embody "the constitutional principle of separation of powers by ensuring that courts do not exceed their own authority by imposing multiple punishments not authorized by the legislature." *Woellhaf*, 105 P.3d at 214.

¶40    Our General Assembly has decreed that when a defendant's conduct establishes the commission of more than one offense, he "may be *prosecuted* for each such offense." § 18-1-408(1), C.R.S. (2019) (emphasis added). But if one offense is a lesser included offense of another, he "may not be *convicted*" of both. § 18-1-408(1)(a) (emphasis added). Simultaneous convictions for an offense and a lesser included offense would give rise to multiplicity issues. *See id.*

22

¶41 When we find multiplicitous convictions, the remedy is "to vacate one of the underlying convictions as well as the . . . sentence based upon it." *Wood*, ¶ 28, 433 P.3d at 593 (quoting *United States v. Barrett*, 496 F.3d 1079, 1095 (10th Cir. 2007)). And we have made clear that in deciding which conviction or convictions should be vacated to honor the Double Jeopardy Clauses, "a trial court 'should . . . enter as many convictions and impose as many sentences as are legally possible to fully effectuate the jury's verdict.'" *Id.* (quoting *People v. Glover*, 893 P.2d 1311, 1315 (Colo. 1995)); *see also Halaseh v. People*, 2020 CO 35M, ¶ 10, 463 P.3d 249, 252 (observing that when multiple convictions cannot stand "by reason of either constitutional or statutory prohibitions," we have "instructed trial courts to select the combination of offenses that can simultaneously stand that produce the most convictions and the longest sentences, in order to maximize the effect of the jury's verdict").

¶42 As pertinent here, an offense is a lesser included offense of a greater offense when "[i]t is established by proof of the same or less than all the facts required to establish the commission" of the greater offense. § 18-1-408(5)(a). But what test do we apply to evaluate whether an offense is a lesser included offense of another offense under section 18-1-408(5)(a)? We answered this question recently in *Reyna-Abarca*, where we held that an offense is a lesser included offense of a greater offense for purposes of section 18-1-408(5)(a) "if the elements of the lesser offense

23

are a subset of the elements of the greater offense, such that the lesser offense contains only elements that are also included in the elements of the greater offense." *Reyna-Abarca*, ¶ 64, 390 P.3d at 826.

¶43    In this case, the division found, and we agree, that attempted first degree murder is a lesser included offense of first degree murder pursuant to section 18-1-408(5)(a) because the elements of the former are a subset of the elements of the latter, such that the former contains only elements that are also included in the elements of the latter. Put differently, by proving the elements of first degree murder, a prosecutor necessarily establishes the elements of attempted first degree murder.

¶44    This does not end our inquiry, though. There is still the question of whether *this particular* attempted first degree murder is a lesser included offense of *this particular* first degree murder.

¶45    In *Reyna-Abarca*, we did not mean to suggest that whether an offense is a lesser included offense of another offense is strictly "a consequence of the statutory elements of the respective offenses alone." *People v. Rock*, 2017 CO 84, ¶ 17, 402 P.3d 472, 478. As we recognized in *Rock*, convictions for two separate offenses, the elements of one of which constitute a subset of the elements of the other, "can clearly stand if the offenses were committed by distinctly different conduct." *Id.*

24

¶46     In determining whether two offenses are factually distinct, we generally consider: (1) whether the acts occurred at different times and were separated by intervening events; (2) whether there were different volitional acts or new volitional departures in the defendant's course of conduct; and (3) other factors such as temporal proximity, the location of the victim (e.g., whether the victim was moved), the defendant's intent (as manifested through his conduct and utterances), and the number of victims. *See Quintano v. People*, 105 P.3d 585, 591 (Colo. 2005).  As it relates to the last of these considerations, both the court of appeals and our court have recognized that in some circumstances the presence of multiple victims alone renders the offenses factually distinct. *See, e.g.*, *People v. Espinoza*, 2020 CO 43, ¶ 21, 463 P.3d 855, 860 (holding that "offenses defined in terms of their victimization of another and committed against different victims are not capable of being proved by identical evidence within the contemplation of section 18-1-408(3)"); *People v. Borghesi*, 66 P.3d 93, 94–95 (Colo. 2003) (upholding two aggravated robbery convictions based on the same criminal conduct because there were two victims and aggravated robbery is a crime intended to protect persons); *People v. Harris*, 2016 COA 159, ¶ 56, 405 P.3d 361, 372 (concluding that "the existence of multiple victims created factually distinct offenses" for purposes of section 18-1-408(1)(e)).

¶47 Here, the People posit that this particular first degree murder and this particular attempted first degree murder were committed by distinctly different conduct because Y.M. was the victim of the former and E.O. was the victim of the latter. Embracing the premise of the People's hypothesis, the division treated the offenses as involving two different victims. *Jackson*, ¶¶ 82–83. But the division nevertheless discerned that this particular first degree murder and this particular attempted first degree murder were *not* committed by distinctly different conduct. *Id.* at ¶ 83. In so doing, the division viewed the evidence through the prism of the transferred intent doctrine, concluding that the shooter's intent was to kill E.O. and that such intent "transferred to Y.M. and made [the shooter] criminally liable for Y.M's death." *Id.* at ¶ 89. The division then reasoned that "[b]y proving the first degree murder of Y.M under this [doctrine], the prosecution necessarily proved that [the shooter] intended and attempted to kill E.O." *Id.* Therefore, although the division believed that the two offenses involved different victims, it nonetheless held that this particular attempted first degree murder was a lesser included offense of this particular first degree murder. *Id.*

¶48 The division's approach is out of sync with Colorado case law establishing that in circumstances like those implicated here, the presence of multiple victims renders the offenses factually distinct. *See, e.g.*, *Espinoza*, ¶ 21, 463 P.3d at 860; *Borghesi*, 66 P.3d at 94–95; *Harris*, ¶ 56, 405 P.3d at 372. If, as the division

26

incorrectly believed, this incident involved two separate victims, our case law would require that the offenses at issue be deemed factually distinct.

¶49 Moreover, as the following hypothetical illustrates, there are critical shortcomings in the division's double jeopardy analysis. Suppose that *A* shot *B* after deliberation and with the intent to kill *B*, the bullet hit and wounded *B*, passed through *B*, and hit and killed *C*, an innocent bystander behind *B*.[12] Under the division's rationale, *A* may be convicted of first degree murder with respect to *C*, but may not also be convicted of attempted first degree murder with respect to *B*, even though *A* shot and wounded *B* with the intent to kill *B*. Instead, the division would presumably rule that, notwithstanding the presence of multiple victims, the attempted first degree murder of *B* is a lesser included offense of the first degree murder of *C* because *A*'s intent to kill *B* transferred to *C* and, thus, by proving *A* guilty of the first degree murder of *C*, the prosecution necessarily proved that *A* intended and attempted to kill *B*. It hardly bears stating that this would be an undesirable result.

---

[12] This factual scenario, which includes two victims and is akin to a bad-aim situation, is not far-fetched. In *Poe v. State*, 671 A.2d 501, 502 (Md. 1996), the defendant, intending to kill his estranged wife, shot and wounded her, but the bullet passed through her and killed a child standing behind her.

¶50     The wide-ranging statutory definition of first degree murder in Colorado averts the need for mental gymnastics, never mind legal fictions, in order to hold *A* fully liable.  *A* may be convicted of first degree murder for *C's* death because, "[a]fter deliberation and with the intent to cause the death of a person other than himself," (i.e., *B*), *A* "cause[d] the death of that person or of another person," (i.e., *C*). § 18-3-102(1)(a).  And *A* may be convicted of the attempted first degree murder of *B* because, acting after deliberation and with the intent to kill *B*, *A* aimed at and shot *B*, thereby "engag[ing] in conduct constituting a substantial step toward the commission of the offense" of first degree murder.  § 18-2-101(1), C.R.S. (2019).

¶51     Significantly, because there is no need to resort to the much-maligned transferred intent doctrine, the muddled legal fiction that is its nucleus does not complicate the double jeopardy analysis.  This particular attempted first degree murder of *B* is not a lesser included offense of this particular first degree murder of *C* because these offenses, which are intended to protect persons and are, in fact, defined in terms of their victimization of persons, were committed against different victims.  Thus, the two offenses are factually distinct, which means that *A* may stand convicted of both without giving rise to double jeopardy concerns.

¶52     This analytical framework is pliable and fits any factual situation, including the one before us, though it yields the opposite result here on the double jeopardy front.  The shooter may be convicted of first degree murder because, "[a]fter

28

deliberation and with the intent to cause the death of a person other than himself," i.e., Y.M., he caused "the death of that person," although the death "of another person" would have done just as well. § 18-3-102(1)(a). But the shooter may not also stand convicted of attempted first degree murder because the attempted first degree murder relates to the same criminal conduct and the same victim involved in the first degree murder of Y.M. Contrary to the People's contention, when the shooter aimed at and shot Y.M., he *intended* and attempted to kill Y.M., even if he mistakenly believed that Y.M. was E.O. That is to say, unlike the hypothetical where the bullet injures and passes through the intended victim and then strikes an unintended victim by accident, this mistaken-identity case involves only one victim: Y.M. The shooter attempted to kill the same person he actually killed. That the shooter *wanted* to kill E.O. is inconsequential. Therefore, this particular attempted first degree murder is a lesser included offense of this particular first degree murder (albeit for a different reason than that espoused by the division), and the conviction for the former must merge into the conviction for the latter.

¶53 The People push back, though, asserting that the first degree murder charge listed Y.M. as the victim while the attempted first degree murder charge listed E.O. as the victim. And, continue the People, that's how they argued the case to the

jury without objection.[13]  Be that as it may, we have now concluded that, as a matter of law, the evidence introduced at trial established that the only person the shooter could have attempted to kill when he aimed at and shot Y.M. with the *intent* to kill was Y.M., not E.O.  We reiterate that the fact that the shooter *wanted* to kill E.O. and mistakenly believed that Y.M. was E.O. is neither here nor there.  "Wanting, desiring, or hoping to hit [E.O.] . . . is not the same as intending to hit [E.O.]." *Wieland*, 643 A.2d at 467.  "One's intent is to hit one's target," not "to hit some other person" one "believes the target to be." *Id.*; *see also id.* at 466 ("If one shoots at the President, erroneously believing him to be a cleverly disguised foreign spy, one intends to shoot the President.").  Thus, notwithstanding the way the People charged count 2 and the arguments they advanced in front of the jury without objection, as a legal matter and based on the evidence introduced at trial, the attempted first degree murder conviction cannot relate to E.O.; it can only relate to Y.M.

---

[13] We note that none of the jury's elemental instructions and verdict forms on counts 1 and 2 identified a victim.  Rather, they used the same generic language the legislature used to define the crime of first degree murder and, by extension, the crime of attempted first degree murder.  As a result, the jury's finding on count 2 simply reflects that "another person" was the victim of the attempted first degree murder.

¶54 We are just as unmoved by the People's assertion that when the shooter arrived at E.O.'s apartment complex, he completed the crime of attempted first degree murder with respect to E.O., and that, thereafter, when he approached, aimed at, and shot Y.M., he committed the factually distinct crime of first degree murder with respect to Y.M. Even assuming, without deciding, that driving to E.O.'s apartment complex after the meeting was sufficient to constitute a substantial step toward the commission of first degree murder, this argument fails, though we concede it has intuitive appeal.

¶55 First, there is no factual basis for the bifurcated methodology proposed by the People. This was a single, uninterrupted criminal episode in which the shooter, after deliberation and with the intent to kill, killed Y.M. The plan formulated and set in motion during the meeting continued as the shooter went to E.O.'s apartment complex, waited for the arrival of the gold SUV, and then approached, aimed at, and shot the driver with the intent to kill him. Nothing changed during that chain of events to warrant viewing the shooter's arrival at E.O.'s apartment complex as the end of one crime and some subsequent moment as the beginning of a factually distinct crime. From its inception, the plan was never to commit attempted first degree murder; the plan all along was to commit first degree murder. To slice the incident into two separate transactions and deem, on the one hand, the arrival at E.O.'s apartment complex as the completion of the

crime of attempted first degree murder, and on the other, walking up to the gold SUV, aiming at the driver, and shooting him with the intent to kill him as the factually distinct crime of first degree murder, would be to engage in incomplete, inaccurate, and misleading analysis.

¶56 True, during the meeting, it was clear that the shooter *wanted* to kill E.O., not Y.M. But the person the shooter actually *intended* to kill was Y.M.—the person the shooter approached, aimed at, and shot.

¶57 Second, the People do not provide any legal basis to buttress their invitation to analyze the events in question piecemeal. And we are aware of none.

¶58 Finally, if, as planned, the shooter had actually shot and killed E.O. instead of Y.M., the People would not be entitled to the segmented analysis they request. And in that case, even they admit that the shooter—and, correspondingly, Jackson—could not have been convicted of both first degree murder (for the murder of E.O.) and attempted first degree murder (for the attempted murder of E.O.). Why should it be any different simply because, by mistake, the person the shooter approached, aimed at, and shot ended up being Y.M., not E.O.?

¶59 In sum, because a mistaken-identity case like this one has only one victim— here, Y.M.—we reject the People's position and conclude that this particular attempted first degree murder is not factually distinct from this particular first degree murder. Hence, the former is a lesser included offense of the latter and the

32

Double Jeopardy Clauses dictate that Jackson may not stand convicted of both offenses.

## D. The Trial Court Plainly Erred

¶60 We have determined that the trial court erred in entering convictions and imposing sentences for both first degree murder (count 1) and attempted first degree murder (count 2). Because Jackson did not preserve his double jeopardy claim, though, we may only reverse if this was plain error. *Reyna-Abarca*, ¶ 47, 390 P.3d at 823. Jackson maintains that the trial court's error was obvious and substantial and, therefore, plain. *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005) ("Plain error addresses error that is both 'obvious and substantial.'"). The People do not argue otherwise. We take such silence to be the People's implicit concession of the issue. *Cf. Hoang v. People*, 2014 CO 27, ¶ 52, 323 P.3d 780, 790 (noting the People's failure to contest the defendant's timely filing of his notice of appeal, which he discussed in his opening brief with the court of appeals, and "accept[ing] this implicit concession").

¶61 Regardless, we independently rule that the trial court plainly erred. Double jeopardy principles and section 18-1-408(1)(b) clearly prohibit convictions for both of the offenses at issue. As such, the trial court's error was obvious. And we have little difficulty finding that the error was also substantial because "[i]n both our own jurisprudence and in case law nationally, courts have invariably concluded

33

that when a defendant's double jeopardy rights are violated . . . , such a violation requires a remedy." *Reyna-Abarca*, ¶ 81, 390 P.3d at 828.

¶62 The appropriate remedy in this case is to vacate the conviction and sentence on count 2 and to leave undisturbed the conviction and sentence on count 1. *See Halaseh*, ¶ 10, 463 P.3d at 252; *Wood*, ¶ 28, 433 P.3d at 593. Thus, we remand with instructions to return the case to the trial court to amend the mittimus accordingly.

## III. Conclusion

¶63 We conclude that the Double Jeopardy Clauses dictate that Jackson may not stand convicted of both first degree murder and attempted first degree murder under the facts of this case. Though the division reached the same result, it did so by erroneously relying on the transferred intent doctrine. Accordingly, we affirm on other grounds. We remand with instructions to return the case to the trial court to amend the mittimus by vacating the conviction and sentence for attempted first degree murder.