The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
May 19, 2022

**2022COA54**

**No. 21CA0962, *People v. Eason* — Criminal Procedure — Trial Jurors — Challenge to Pool — Mistrial on Ground Fair Jury Pool Cannot be Assembled Due to Public Health Crisis; Colorado Constitution — Article III — Separation of Powers**

The Colorado Supreme Court adopted Crim. P. 24(c)(4) in 2020 during the COVID-19 pandemic. That rule allows a trial court to declare a mistrial if the court determines that, due to a public health crisis or limitations arising therefrom, a fair jury pool cannot be safely assembled. A division of the court of appeals holds that the rule does not run afoul of the separation of powers doctrine.

COLORADO COURT OF APPEALS                    **2022COA54**

Court of Appeals No. 21CA0962
Boulder County District Court No. 20CR1109
Honorable Thomas F. Mulvahill, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

William Robert Eason,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE J. JONES
Gomez, J., concurs
Lipinsky, J., specially concurs

Announced May 19, 2022

Philip J. Weiser, Attorney General, Brian M. Lanni, Assistant Attorney General
II, Denver, Colorado, for Plaintiff-Appellee

Gard Law Firm, L.L.C., Jeffrey S. Gard, Austin Q. Hiatt, Boulder, Colorado, for
Defendant-Appellant

¶ 1     Defendant, William Robert Eason, appeals the district court's judgment of conviction entered on a jury's verdict finding him guilty of menacing.  He challenges the constitutionality of Crim. P. 24(c)(4), which allows a court, on a party's motion or on its own, to declare a mistrial at any time before trial if a fair jury pool can't safely be assembled due to a public health crisis or limitations resulting therefrom.  He argues that by adopting this rule, the Colorado Supreme Court violated the separation of powers doctrine by intruding on the other government branches' authority to adopt or enact emergency laws relating to public health.

¶ 2     But we hold that the supreme court's adoption of Rule 24(c)(4) was a lawful exercise of its authority under Colorado Constitution article VI, section 21, to promulgate procedural rules governing criminal cases and that, in any event, the rule doesn't conflict with any executive branch order or legislative enactment and therefore doesn't violate the separation of powers doctrine.  We also reject Eason's other challenges to his conviction and therefore affirm.

## I.     Background

¶ 3     This case stems from an altercation between Eason and two teenage siblings, B.G. and P.G. (the victims) in Boulder.  Eason

confronted B.G. and P.G. because he believed their trailer home was on an easement on his property. Eason became irate and started hitting the trailer with a three-foot wooden dowel. Several times he said he was going to get a gun and kill the victims' stepfather. B.G. tried to stop Eason from hitting the trailer and stepped in front of him, but Eason grabbed him by the neck with one hand and held him up against the side of the trailer while raising the dowel above his head. P.G. then intervened. When he pushed the two apart, Eason fell to the ground. After the altercation, the victims' mother called the police to report what had happened. Deputy Kugel spoke with the victims and their mother that day but wasn't able to speak with Eason.

¶ 4 Two days later, Deputy Williams contacted Eason and asked him what had happened. Eason admitted to hitting the trailer with the wooden dowel, but he said that he had to defend himself after B.G. had confronted him. He denied ever touching B.G. Eason also said he told the victims he was going to get his gun to protect himself. Deputy Williams arrested Eason.

¶ 5 The People charged Eason with second degree assault, third degree assault, and two counts of misdemeanor menacing. On

2

October 2, 2020, Eason pleaded not guilty and the district court scheduled Eason's jury trial for March 1, 2021.

¶ 6      Before trial, on December 4, 2020, Eason's counsel filed a motion to dismiss the case based on the prosecution's failure to properly preserve Deputy Kugel's bodycam recording of his discussions with the victims and their mother on the day of the incident. The district court denied the motion and Eason's subsequent motion to reconsider.

¶ 7      The day Eason's trial was set to begin, the district court, sua sponte, declared a mistrial under Rule 24(c)(4) due to COVID-19 restrictions and reset the trial for June 7, 2021. Eason's counsel filed an objection to the court's mistrial order and moved to dismiss the case because Eason had been ready for trial on March 1. Counsel argued that, by implementing Rule 24(c)(4), the Colorado Supreme Court "usurped the power of the legislature and the executive branches of government," that Rule 24(c)(4) didn't apply in any event because a fair jury pool could have been assembled, and that the court could not declare a mistrial because limiting the

number of courtrooms for trials was something within the court's control. The district court denied Eason's objection and motion.[1]

¶ 8    On April 5, 2021, Eason's counsel renewed his motion to dismiss, arguing that the speedy trial deadline had passed on April 2. The district court denied that motion as well and later rescheduled the trial for June 9, 2021.

¶ 9    On the second day of trial, after learning on the first day of trial that the victims had given written statements to the police, which the prosecution hadn't provided to the defense, Eason's counsel renewed his motion to dismiss, claiming a Crim. P. 16 violation. The prosecutor agreed that there had been a Rule 16 violation. As a sanction, the district court dismissed the menacing charge relating to P.G. But the court declined to dismiss the menacing charge relating to B.G. or the assault charges as a discovery sanction.

---

[1] Eason's counsel objected to the court's prioritization of cases, arguing that there was no need to limit trials to one per week in a single courtroom. As discussed below, it was the combination of the one trial in one courtroom per week limitation and the prioritization of cases that resulted in Eason's trial being reset.

¶ 10    A jury found Eason guilty of menacing but not guilty of assault.

## II.    Discussion

¶ 11    Eason contends that the district court erred by (1) declaring a mistrial and refusing to dismiss the case on speedy trial grounds because (a) Rule 24(c)(4) violates the separation of powers doctrine and is therefore unconstitutional and (b) the court didn't make sufficient findings justifying a mistrial and a mistrial wasn't justified under Rule 24(c)(4) because the trial could have been conducted safely on March 1, 2021; and (2) denying his motions to dismiss despite the prosecution's multiple discovery violations.[2]  We address and reject each of these contentions in turn.

### A.    Constitutionality of Rule 24(c)(4)

¶ 12    On April 7, 2020, the Colorado Supreme Court amended Rule 24 by adding subsection (c)(4).  Rule Change 2020(07), Colorado Rules of Criminal Procedure (Amended and Adopted by the Court

---

[2] Eason also argued in his opening brief that the Rule 24(c)(4) continuance pushed the case beyond the speedy trial deadline of section 18-1-405(6)(e), C.R.S. 2021.  However, he withdrew this argument based on the supreme court's intervening decision in *People v. Sherwood*, 2021 CO 61.

En Banc, Apr. 7, 2020), https://perma.cc/6DET-KNTH. With amendments the court adopted on July 22, 2020, Rule 24(c)(4) provides as follows:

> At any time before trial, upon motion by a party or on its own motion, the court may declare a mistrial in a case on the ground that a fair jury pool cannot be safely assembled in that particular case due to a public health crisis or limitations brought about by such crisis. A declaration of a mistrial under this paragraph must be supported by specific findings.

Rule Change 2020(24), Colorado Rules of Criminal Procedure (Amended and Adopted by the Court En Banc, July 22, 2020), https://perma.cc/CET7-Z88V.

¶ 13 Before turning to the merits of Eason's contention that this rule is unconstitutional, we must address the People's argument that we can't opine on the constitutionality of Rule 24(c)(4) because only the supreme court "can overrule [its] precedents concerning matters of state law." We reject the People's argument because its premise is incorrect: the rule isn't a "precedent" as contemplated by the cases on which the People rely. Those cases all deal with supreme court case law. *See People v. Novotny*, 2014 CO 18, ¶ 26 ("we alone can overrule our prior precedents concerning matters of

state law"; discussing a line of Colorado Supreme Court case law); *People v. Denhartog*, 2019 COA 23, ¶ 78 ("[I]f a precedent of the supreme court 'has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions,' the court of appeals should follow the *case* which directly controls . . . ." (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989))) (emphasis added).

¶ 14    Other divisions of this court have held that, based largely on the expansive statutory grant of jurisdiction in section 13-4-102, C.R.S. 2021, the court of appeals may determine the constitutionality of a procedural rule adopted by the supreme court. *See People v. Montoya*, 251 P.3d 35, 46 (Colo. App. 2010), *overruled on other grounds by People v. Walker*, 2014 CO 6; *People in Interest of T.D.*, 140 P.3d 205, 210-12 (Colo. App. 2006), *abrogated on other grounds by People in Interest of A.J.L.*, 243 P.3d 244 (Colo. 2010); *see also Duff v. Lee*, 439 P.3d 1199, 1205 (Ariz. Ct. App. 2019) (noting that the Arizona Supreme Court's adoption of a rule doesn't constitute a determination that it is valid and constitutional against any challenge and affirming the Arizona Court of Appeals' power to determine the constitutionality of such a rule), *aff'd in part, vacated*

*in part on other grounds*, 476 P.3d 315 (Ariz. 2020). We agree with those divisions.

¶ 15    Turning to the merits of Eason's constitutional challenge to Rule 24(c)(4), we conclude that the rule doesn't violate the separation of powers doctrine.

### 1.    Standard of Review

¶ 16    Whether a rule adopted by the supreme court is constitutional is a question of law that we review de novo. *See People v. Pennington*, 2021 COA 9, ¶ 25 (we review a separation of powers challenge de novo); *People v. Reyes*, 2016 COA 98, ¶ 23 (same).

### 2.    Applicable Law and Analysis

¶ 17    Article III of the Colorado Constitution says that

> [t]he powers of the government of this state are divided into three distinct departments, — the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.

Put a bit more simply, "the legislative, executive, and judicial branches of government may exercise only their own powers and

8

may not usurp the powers of another co-equal branch of government." *Vagneur v. City of Aspen*, 2013 CO 13, ¶ 34.

¶ 18    The state's legislative power is vested in the General Assembly, subject to the people's right to propose laws and amendments to the constitution, to enact or reject laws and amendments by vote, and to approve or reject "any act or item, section, or part of any act of the general assembly" by vote.  Colo. Const. art. V, § 1(1).

¶ 19    It is the executive department's — or more specifically, the governor's — responsibility to "take care that the laws [are] faithfully executed."  Colo. Const. art. IV, § 2.

¶ 20    The state's judicial power is vested in the courts.  Colo. Const. art. VI, § 1.  One such power is the supreme court's power to make rules:

> The supreme court shall make and promulgate rules governing the administration of all courts and *shall make and promulgate rules governing practice and procedure in civil and criminal cases*, except that the general assembly shall have the power to provide simplified procedures in county courts for the trial of misdemeanors.

Colo. Const. art. VI, § 21 (emphasis added).  The General Assembly itself has recognized the supreme court's authority to adopt such

rules. *See* § 13-2-109(1), C.R.S. 2021 ("The supreme court has the power to prescribe, from time to time, *rules of pleading, practice, and procedure with respect to all proceedings in all criminal cases* in all courts of the state of Colorado.") (emphasis added); *see also Frasco v. People*, 165 P.3d 701, 707 (Colo. 2007) (Martinez, J., specially concurring) ("We have the power to issue rules of criminal procedure that can control what juries in criminal cases may take into the deliberation room." (citing section 13-2-109)).

¶ 21     So if Rule 24(c)(4) is a rule "governing practice and procedure" — that is, a procedural rule — it doesn't run afoul of separation of powers. We conclude that Rule 24(c)(4) is a procedural rule. Alternatively, even if there is some aspect of public policy underlying the rule, it doesn't conflict with any legislative (or executive) expression of public policy and is therefore lawful.

¶ 22     "[R]ules adopted to permit the courts to function and function efficiently are procedural whereas matters of public policy are substantive and are therefore appropriate subjects for legislation." *People v. Wiedemer*, 852 P.2d 424, 436 (Colo. 1993) (holding that section 16-5-402, C.R.S. 2021, which establishes time limits for seeking postconviction relief under Crim. P. 35(c), is substantive

and therefore not a violation of separation of powers); *accord Borer v. Lewis*, 91 P.3d 375, 380 (Colo. 2004) (section 13-25-127, C.R.S. 2021, which sets forth the burden of proof in civil cases, is substantive and therefore not a violation of separation of powers); *People v. Bondurant*, 2012 COA 50, ¶ 17. This distinction isn't always clear. "[B]ut 'legislative policy and judicial rule making powers may overlap to some extent so long as there is no substantial conflict between statute and rule.'" *Borer*, 91 P.3d at 380 (quoting *People v. McKenna*, 196 Colo. 367, 373, 585 P.2d 275, 279 (1978)); *accord Wiedemer*, 852 P.2d at 436.

¶ 23    Rule 24(c)(4) clearly relates to docket management, jury pool assembly, and trial practice — matters procedural in nature. It doesn't declare a public health crisis. Rather, the supreme court adopted the rule in response to such declarations by the executive branch.[3] It did so to address effects of the public health crisis on procedural aspects of the judicial process. Rule 24(c)(4) is intended

---

[3] Other state courts implemented similar rules or orders in response to the effects of COVID-19. *E.g., Commonwealth v. Lougee*, 147 N.E.3d 464, 468-69 (Mass. 2020) (discussing such emergency orders in Massachusetts).

to mitigate the effect of the public health crisis on criminal trials by, for example, reducing the possibility that such trials will need to be stopped as a result of a juror or jurors becoming ill.

¶ 24     In any event, even if we were to conclude that the rule touches on aspects of public policy — for example, a desire to protect prospective jurors, court personnel, parties, attorneys, and others — this overlap wouldn't establish a separation of powers violation. This is so because Eason hasn't shown that the rule conflicts with any legislative enactment or executive branch public health order.

¶ 25     Contrary to Eason's assertion, the mere fact the General Assembly and the executive branch may adopt public health edicts doesn't establish the existence of a conflict.  He attempts to show an actual conflict only by asserting that the rule somehow "changes . . . the speedy trial statutes or emergency public health orders"[4]

---

[4] On March 22, 2020, the executive branch issued Colorado Executive Order No. D 2020 013, https://perma.cc/RV3P-HTN9, pursuant to Colorado Constitution article IV, section 2, and the Colorado Disaster Emergency Act, sections 24-33.5-701 to -717, C.R.S. 2021, ordering

> Colorado employers to reduce their in-person
> work forces by fifty percent, and order[ing] the
> Executive Director of the Colorado Department

12

and that the rule somehow intrudes on "the responsibilities placed on the jury commissioners and the state court administrator" under section 13-71-110, C.R.S. 2021.  But he doesn't describe any actual conflict between the rule and any executive order or statute, and we don't see any.[5]

¶ 26     Thus, we conclude that Rule 24(c)(4) doesn't run afoul of the separation of powers doctrine.

---

of Public Health and Environment (CDPHE) to issue a public health order defining critical emergency personnel, infrastructure, government functions, and other activities that are exempt from the directives in this Executive Order.

[5] In his reply brief, Eason asserts a conflict with section 18-1-301(2), C.R.S. 2021, which addresses "[t]ermination" of trials.  But that statute doesn't purport to contain an exclusive list of reasons for which a trial may properly be terminated.  *See Paul v. People*, 105 P.3d 628, 633 (Colo. 2005); *People v. Berreth*, 13 P.3d 1214, 1217 (Colo. 2000) (reasons for a mistrial listed in section 18-1-301(2)(b) aren't exclusive).  And section 18-1-405(6)(e) provides that the period of delay resulting from a mistrial, not to exceed three months, doesn't count against the speedy trial deadline, and it doesn't indicate any limits on a court's reasons for declaring a mistrial.

## B. Declaration of a Mistrial

¶ 27     Eason contends that the district court erred by declaring a mistrial because it didn't make specific findings as required under Rule 24(c)(4) and because the court's reasons for the mistrial were matters within the court's control. Again, we disagree.

### 1. Additional Background

¶ 28     On March 1, 2021, the first day of trial, Eason and his attorney appeared in court ready for trial. But the district court didn't start Eason's trial that morning; instead, it declared a mistrial under Rule 24(c)(4). The court explained that "because of the circumstances created by the pandemic and the health restrictions, particularly with respect to social distancing, this district is only able to select one jury at a time." It also noted that another case, which was ready for trial, had priority on the docket. The court later issued a written order supplementing its findings as follows:

- The Governor had declared a disaster emergency because of the COVID-19 pandemic and the executive branch had issued health orders encouraging the public to stay at

14

home to reduce the spread of the highly contagious and potentially deadly virus.

- COVID-19 spreads less easily when interactions between people are limited and distance between people is increased. (The court described various social distancing measures that were then in place.)

- Even though Colorado courts had, to some extent, re-opened and resumed trials in person, courthouse capacity was limited so as to comply with the physical distancing requirements of public health orders.

- Boulder County's public safety mandate required six feet of spacing between people in the courthouse.

- These requirements "severely" limited the courthouse's overall occupant capacity. And the juror rooms and other spaces designated for juror use weren't "large enough to safely accommodate a socially distanced jury during trial breaks and deliberations."

- The other trials that were proceeding involved more serious offenses and highly sensitive evidence,

necessitating more prospective and selected jurors and resulting in longer trials.

- Because the potential jury pool included many older adults and persons with underlying health risks, the court considered "any disproportionate risk of serious infection[s]" that would likely increase the need for a potential juror to "postpone jury service, be excused for hardship, and/or fail to appear for jury duty." Those risks directly impacted the jury pool and the ability to assemble a fair representation of the community.

### 2. Standard of Review and Applicable Law

¶ 29 We review a district court's decision to declare a mistrial for an abuse of discretion. *People v. Jackson*, 2018 COA 79, ¶ 19, *aff'd*, 2020 CO 75. A court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair, or based on a misunderstanding or misapplication of the law. *People v. Knapp*, 2020 COA 107, ¶ 31.

¶ 30 A district court is justified in declaring a mistrial when present circumstances amount to "manifest necessity" or when "the ends of public justice would not be served by a continuation of the

16

proceedings." *People v. Segovia*, 196 P.3d 1126, 1133 (Colo. 2008) (quoting *United States v. Jorn*, 400 U.S. 470, 485 (1971)); *Jackson*, ¶ 21.

¶ 31 As noted, Rule 24(c)(4) permits a trial court, by a party's motion or on its own, to declare a mistrial at any time before trial "on the ground that a fair jury pool cannot be safely assembled in that particular case due to a public health crisis or limitations brought about by such crisis." "[D]eclar[ing] . . . a mistrial under this [rule] must be supported by specific findings." Crim. P. 24(c)(4).

### 3.    Analysis

¶ 32 Eason argues first that the district court erred by failing to make specific findings of fact supporting its decision to declare the mistrial under Rule 24(c)(4). We aren't persuaded.

¶ 33 The court made numerous specific findings in declaring the mistrial, as summarized above. Eason's contention that these findings didn't concern his particular case is simply wrong. They concerned his case and others. He doesn't explain why the limitations imposed by the COVID-19 pandemic and the various public safety orders wouldn't apply to his case, and we can't see

any reason why they wouldn't. *Cf. People v. Sherwood*, 2021 CO 61, ¶¶ 33-34 (the district court properly continued trial after it declared a mistrial because it couldn't safely assemble a fair jury pool due to COVID-19 in the first place).

¶ 34   Eason also contends that the district court's decision to limit the courthouse to one jury trial per week shows that the circumstances giving rise to the mistrial weren't outside the court's control. He is mistaken. The mistrial wasn't declared because of "docket congestion," as Eason argues, but because of the pandemic and related public health orders, which imposed limitations on the use of the courthouse — matters obviously beyond the court's control. *See People v. Lucy*, 2020 CO 68, ¶ 1 ("COVID-19, the highly contagious and potentially deadly illness," has caused trial courts to struggle "with effectuating a defendant's statutory right to speedy trial amid this unparalleled public health crisis.").[6]

[6] Eason's counsel asserts that the Boulder courts had been conducting multiple trials at the same time shortly before the mistrial order in this case. There is no actual record evidence that this was so. But, in any event, the court's order reflects a thoughtful consideration of the then-current health orders and the Boulder courts' practical ability to comply with those orders under present circumstances. To the extent there was some reevaluation

18

¶ 35     In sum, we see no abuse of discretion.

## C.     Discovery Violations

¶ 36     Lastly, Eason contends that the district court erred by denying his motions to dismiss based on the prosecution's discovery violations — the destruction of Deputy Kugel's bodycam recording and the late disclosure of two written witness statements.  He argues that the discovery violations denied him his right to due process and that the only appropriate remedy was dismissal.  We conclude, however, that the district court didn't abuse its discretion by refusing to dismiss the entire case.

### 1.     Applicable Law and Standard of Review

¶ 37     To establish a due process violation based on the state's failure to preserve potentially exculpatory evidence, the defendant "must prove that the evidence was suppressed or destroyed by state action and that the evidence was material."  *People v. Braunthal*, 31 P.3d 167, 172 (Colo. 2001); *accord People v. Greathouse*, 742 P.2d

---

of the appropriateness of conducting multiple trials at the same time, it isn't for us to say that such revaluation was improper.  We take notice that the pandemic presented a need to constantly reexamine the measures necessary to respond to it.

19

334, 337-38 (Colo. 1987). More specifically, the defendant ordinarily must show that (1) the state suppressed or destroyed the evidence; (2) the evidence had an exculpatory value that was apparent before it was destroyed; and (3) he was unable to obtain comparable evidence by other reasonably available means. *Braunthal*, 31 P.3d at 173; *People v. Enriquez*, 763 P.2d 1033, 1036 (Colo. 1988); *see California v. Trombetta*, 467 U.S. 479, 489 (1984).

¶ 38    If, however, the evidence in question wasn't apparently exculpatory, but only potentially useful, a defendant alternatively establishes a due process violation if he shows that the state suppressed or destroyed the evidence in bad faith. *See Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *People v. Wyman*, 788 P.2d 1278, 1279 (Colo. 1990); *People v. Young*, 2014 COA 169, ¶ 74.

¶ 39    If we determine that a due process violation occurred, then we must decide whether the district court "fashioned an appropriate remedy, [while] recognizing that the trial court has broad discretion in this regard." *Enriquez*, 763 P.2d at 1036. In determining the appropriate remedy for the state's destruction of evidence amounting to a due process violation, a court should consider the state's degree of culpability, the need to preserve the integrity of the

20

truth-finding process, and the need for deterrence of the conduct at issue. *See People v. Collins*, 730 P.2d 293, 298 (Colo. 1986). In determining the appropriate remedy for the state's delay in producing evidence, a court should consider (1) the reason for the delay in providing the requisite discovery; (2) any prejudice a party has suffered as a result of the delay; and (3) the feasibility of curing such prejudice by way of a continuance or recess in situations where the jury has been sworn and the trial has begun. *People v. Lee*, 18 P.3d 192, 196 (Colo. 2001). As a general matter, in the event of a discovery violation by the People, dismissal is inappropriate if any prejudice can be cured by a lesser sanction. *Id.* at 197.

¶ 40    We review de novo to determine whether the state violated a defendant's due process rights. *People v. Burlingame*, 2019 COA 17, ¶ 11. But we review whether the district court fashioned an appropriate remedy for an abuse of discretion. *See People v. Holloway*, 649 P.2d 318, 320 (Colo. 1982) (a district court has broad discretion in fashioning a proper remedy to protect the defendant's rights based on the loss or destruction of evidence).

## 2. Destruction of Bodycam Video

¶ 41    Eason argues that the State violated his right to due process by destroying potentially exculpatory evidence — Deputy Kugel's bodycam recording of his discussions with the victims and their mother — which denied him his only means to meaningfully impeach the credibility of key witnesses. We aren't persuaded.

### a. Additional Background

¶ 42    Before trial, Eason's attorney filed a motion for further discovery, requesting that the court order the prosecution to disclose "all written statements and all audio or video recordings made of [Eason], any witness, or police officer in connection with this case." The district court granted Eason's discovery motion and ordered the prosecution to comply with his request.

¶ 43    The prosecution produced several bodycam recordings but said that its lead investigator hadn't received Deputy Kugel's bodycam recording from the Boulder County Sheriff's Department. Eason's attorney then followed up with the Sheriff's Department to get a copy. The prosecution then told Eason's attorney that the Sheriff's Department couldn't produce the bodycam recording

because it had been inadvertently and automatically deleted from the department's digital files.

¶ 44 Eason's attorney filed a motion to dismiss the case, arguing that the State's failure to preserve the deputy's bodycam recording violated Eason's due process rights. Eason's counsel also argued that the Sheriff's Department had prematurely deleted the deputy's bodycam recording in bad faith by failing to preserve evidence for three years in violation of its own document retention policy.

¶ 45 The prosecution responded that Eason hadn't met the requirement of showing the apparent exculpatory value of the deputy's bodycam recording before its destruction. The prosecution challenged Eason's attorney's argument that the video was necessary to impeach the credibility of key witnesses as speculative and said that it had provided counsel with other evidence sufficient to question the witnesses' credibility. As for Eason's counsel's bad faith argument, the prosecution countered that it had produced numerous other bodycam recordings of the investigation and other witness statements, and that the Sheriff's Department had only negligently failed to preserve the one recording.

¶ 46    The district court denied Eason's motion to dismiss for the reasons given in the prosecution's response to the motion.

### b.    Analysis

¶ 47    There is no dispute that the State inadvertently destroyed the deputy's bodycam recording, thus establishing the first element of a due process violation.  Eason contends that the recording had apparent exculpatory value and that it was his only reasonably available means of testing the victims' credibility.  If we conclude, however, that the recording didn't have apparent exculpatory value when it was destroyed, he contends in the alternative that his right to due process was violated because the State destroyed it in bad faith.[7]

¶ 48    We first conclude that Eason failed to establish that the bodycam recording had apparent exculpatory value before the

---

[7] Courts in other jurisdictions have concluded that, unless a defendant establishes that a recording of an interview with a victim had apparent exculpatory value when it was destroyed, there is no due process violation unless the defendant establishes that the recording was potentially useful *and* that the recording was destroyed in bad faith.  *E.g., State v. Cote*, 2015 ME 78, ¶¶ 6-20, 118 A.3d 805, 808-11; *Garcia v. State*, 592 S.W.3d 590, 600-01 (Tex. App. 2019).  Eason appears to accept this view.

24

Sheriff's Department destroyed it. "[E]xculpatory evidence includes evidence which bears on the credibility of a witness the prosecution intends to call at a trial." *Braunthal*, 31 P.3d at 174-75; *see also United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule."). Eason's assertion that the recording had apparent exculpatory value consistent with this definition is conclusory and speculative. *See People v. Daley*, 97 P.3d 295, 299 (Colo. App. 2004) (destruction of clothing didn't warrant sanctions tantamount to dismissal; even though the trial court found that if the clothing had been available, it might have exonerated the defendant, "the mere possibility that testing might lead to exculpatory evidence does not support dismissal of the charges"); *People in Interest of J.M.N.*, 39 P.3d 1261, 1264-65 (Colo. App. 2001) (the defendant failed to establish that a sample taken from a horse's back had apparent exculpatory value when it was destroyed); *People v. Erickson*, 883 P.2d 511, 515 (Colo. App. 1994) (officer's notes of conversation with the defendant, which were apparently destroyed after the officer prepared his written report, didn't have apparent exculpatory value when they were destroyed); *People v. Silva*, 782

25

P.2d 846, 848 (Colo. App. 1989) (the defendant's assertion that the destroyed evidence had exculpatory impeachment value was speculative).

¶ 49     And, Eason's argument that the deputy's bodycam recording was the *only* evidence available to effectively cross-examine key witnesses is belied by the record. The prosecution produced the deputy's written statement documenting his investigation, other witnesses' statements, and nine additional bodycam recordings.

¶ 50     Eason's reliance on *Holloway*, 649 P.2d 318, is misplaced. In that case, police officers inadvertently erased dispatch recordings of an officer's radio broadcast providing the description of a burglar who the prosecution alleged was the defendant. *Id.* at 319. The tapes were crucial to the defendant's claim of misidentification given the discrepancies between the officers' recollection of the burglar's description at trial and the citizen complaint to police allegedly describing the burglar as a Caucasian male. *Id.* at 320. The defendant established that the dispatch recordings had exculpatory value before their destruction because of "the reasonable possibility that the evidence could have been of assistance to the defense." *Id.* (quoting *People v. Morgan*, 199 Colo.

26

237, 241, 606 P.2d 1296, 1299 (1980)). But the record in this case is devoid of any comparable facts.

¶ 51 We also reject Eason's alternative contention that the district court erred by finding that the Sheriff's Department didn't act in bad faith when it destroyed the bodycam recording. The prosecution provided the court with communications showing that the recording had been destroyed due to negligence: it had been mislabeled (and therefore automatically destroyed) or there had been "a download/upload" error. The prosecution noted that this recording was the only one of ten bodycam recordings relating to the case that had been destroyed, and that it had produced the other nine to defense counsel. The district court accepted this explanation.

¶ 52 Eason hasn't persuaded us that the district court abused its discretion by doing so. He doesn't contest the prosecution's stated reasons why the recording was destroyed. He claims only that the destruction of the video resulted from the Sheriff's Department's failure to follow its retention policy. But evidence supports the court's conclusion that this failure was inadvertent, not willful.

¶ 53    Pointing to two other instances of destruction of bodycam recordings, Eason also argues that the State's "chronic failure" to preserve such evidence shows bad faith.  But those two other cases were traffic cases for which the Sheriff's Department's policy required retention for 180 days after creation of the recording and automatic destruction thereafter.  According to the evidence Eason submitted with his motion to dismiss, the Sheriff's Department complied with that policy in both cases: the prosecution failed to timely request the recordings or inform the department of any discovery request for the recordings before the retention period expired.[8]

¶ 54    In this case, in contrast, the Sheriff's Department didn't comply with its policy to retain the recording for three years (the period applicable to criminal cases such as this one).  Thus, the three failures at issue involve two qualitatively different failures by two different entities.  We don't mean to suggest that these incidents are — singularly or collectively — trivial.  They aren't.  But

[8] Eason's counsel relied on this explanation below and doesn't contest it on appeal.

Eason hasn't shown that the district court erroneously concluded that those incidents don't show bad faith.[9]

### 3. Victims' Written Statements

¶ 55 We also aren't persuaded by Eason's contention that dismissal of the entire case was the only appropriate remedy for the prosecution's late disclosure of the victims' written statements.

### a. Additional Background

¶ 56 On the first day of trial, P.G. testified that he had given Deputy Kugel a written statement about his confrontation with Eason. The district court ordered the prosecutor to confirm whether witnesses' written statements existed and, if so, to make them available to Eason's attorney and the court. On the second day of trial, the prosecutor (1) said Deputy Kugel told him both victims had provided written statements; (2) obtained those statements; and (3) gave the statements to Eason's attorney and the court. The prosecutor conceded a Rule 16 violation.

---

[9] We also observe that while the district court could have imposed some lesser sanction for the destruction of the video, Eason's counsel didn't ask for one.

29

¶ 57    Eason's counsel moved to dismiss the case based on this and the prosecution's previous discovery violation (the destruction of the deputy's bodycam recording). As to the written statements, Eason's counsel argued that they were potentially exculpatory as to the menacing charges against Eason — whether he actually threatened to get his gun and return to shoot the victims. The prosecutor countered that the written statements were inculpatory because they corroborated the victims' testimony about Eason's threat to get his gun.

¶ 58    After considering the evidence and the circumstances surrounding the delayed disclosure, the district court dismissed the menacing charge relating to P.G. as a sanction because that charge alleged the threatened use of a gun. But the court declined to dismiss the menacing count relating to B.G. because that count charged a threat by use of the dowel, not a gun. As for the assault charges, the court found that the minor inconsistencies between the written statements and the victims' testimony didn't significantly impact Eason's ability to defend against those

charges.[10]  The court offered to instruct the jury that the Sheriff's

Department and the prosecution had violated their duty to timely

disclose the witness statements, the witness statements wouldn't be

admitted into evidence, and the jury could not infer that those

statements would be helpful to the prosecution.  (The limited

portion of the trial transcript that is part of the record on appeal

doesn't show whether defense counsel took the court up on its

offer.)

### b.    Analysis

¶ 59    While we agree with Eason that, as a general proposition,

evidence bearing on a witness's credibility qualifies as potentially

exculpatory evidence, we can't determine whether the victims'

written statements were potentially exculpatory, nor can we

meaningfully evaluate the district court's ruling, because Eason

hasn't provided us with transcripts of any of the trial testimony.  In

these circumstances, we must presume that the district court's

choice of sanction was appropriate.  *See People v. Sosa*, 2019 COA

182, ¶ 40; *People v. Duran*, 2015 COA 141, ¶ 12 ("If an appellant

---

[10] As noted above, the jury acquitted Eason of assault.

31

intends to urge on appeal that a finding or conclusion is unsupported by or contrary to the evidence, the appellant must include in the record a transcript of all evidence relevant to such finding or conclusion.").

¶ 60 Therefore, we conclude that the district court didn't abuse its discretion.

### III. Conclusion

¶ 61 The judgment is affirmed.

JUDGE GOMEZ concurs.

JUDGE LIPINSKY specially concurs.

JUDGE LIPINSKY, specially concurring.

¶ 62      While I agree with the majority's analysis, I write separately to make clear that today's decision does not mean a law enforcement agency's repeated, systematic destruction of evidence can never violate a defendant's due process rights.

¶ 63      A law enforcement officer's destruction of the recorded statements of a defendant's accusers can directly affect the outcome of the defendant's trial, particularly where, as here, the prosecution's case rests on those witnesses' credibility. But a defendant's due process rights are not violated every time a law enforcement officer destroys evidence — a defendant's conviction or acquittal can hinge on whether the evidence was lost because the officer destroyed it in bad faith or through inadvertence.

¶ 64      The majority accurately recites the test for determining when a law enforcement agency's failure to preserve exculpatory evidence results in a due process violation: "the defendant must establish that (1) the evidence was destroyed by state action; (2) the evidence possessed an exculpatory value that was apparent before it was destroyed; and (3) the defendant was unable to obtain comparable evidence by other reasonably available means." *People v. Braunthal,*

33

31 P.3d 167, 173 (Colo. 2001). "[E]xculpatory evidence includes evidence which bears on the credibility of a witness the prosecution intends to call at trial." *Id.* at 174.

¶ 65    A due process violation occurs if the agency destroyed the evidence in bad faith; in contrast, the "'[n]egligent destruction' of evidence cannot constitute a due process violation." *People v. Young*, 2014 COA 169, ¶ 69, 412 P.3d 676, 685 (citation omitted). And due process is not violated if the agency *inadvertently* destroyed the evidence and the defendant can only establish that the evidence was *potentially* exculpatory. *See People v. Abdu*, 215 P.3d 1265, 1270 (Colo. App. 2009) ("Because defendant claims only that the videotape was potentially useful, and cannot show it had apparent exculpatory value when it was destroyed, he must show bad faith in order to establish a federal or state due process violation.").

¶ 66    "[A] claim that the evidence was only 'potentially useful' cannot prove that the evidence had 'apparent exculpatory value' when it was destroyed" and, thus, that the destruction violated the defendant's due process rights. *Young*, 412 P.3d at 685 (citation omitted); *cf. People v. Holloway*, 649 P.2d 318, 320 (Colo. 1982)

34

(holding that the defendant's due process rights were violated when the prosecution destroyed police dispatch tapes that were "not merely incidental" to the defense theory of misidentification (quoting *People v. Morgan*, 199 Colo. 237, 241, 606 P.2d 1296, 1299 (1980))). In contrast, "[i]t is a violation of the defendant's due process rights when the state fails in bad faith to preserve evidence that might have exonerated him or her." *People v. Scarlett*, 985 P.2d 36, 39 (Colo. App. 1998).

¶ 67 These principles echo the United States Supreme Court's pronouncement in *Arizona v. Youngblood* that, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. 51, 58 (1988). The Supreme Court suggested that an agency's destruction of evidence does not constitute bad faith in the absence of "official animus towards respondents or of a conscious effort to suppress exculpatory evidence." *California v. Trombetta*, 467 U.S. 479, 488 (1984).

¶ 68 The Colorado Supreme Court, "while once having adopted a broader test, has since 'expressly declined to find a broader protection in the state constitution' than that provided federally by

35

*Youngblood.*" *Abdu,* 215 P.3d at 1270 (quoting *People v. Wartena,* 156 P.3d 469, 475 (Colo. 2007)). We are bound by our supreme court's decisions, *People v. Tarr,* 2022 COA 23, ¶ 33, ___ P.3d ___, ___, and, thus, must follow *Youngblood.*

¶ 69    The Colorado cases, however, have not considered whether a law enforcement agency's repeated inadvertent destruction of evidence, in violation of its own retention policy, can rise to the level of bad faith. Notably, here, the People do not challenge Eason's assertion that the Department deleted recordings of body camera videos in two other cases close in time to the destruction of the body camera recording at issue here.

¶ 70    Multiple violations of a preservation policy within a brief period suggest a culture in which officers face no consequences for noncompliance with the policy. This type of pattern and practice can be indicative of a law enforcement agency that condones the destruction of evidence it has a duty to preserve. Courts in other jurisdictions have held that the willful failure to comply with a law enforcement policy can rise to the level of bad faith. *See, e.g., White v. McKinley,* No. 05-0203-CV-W-NKL, 2009 WL 813001, at *10 (W.D. Mo. Mar. 26, 2009) (unpublished opinion) (holding that a

police detective who consistently violated accepted practices and policy acted in bad faith), *aff'd*, 605 F.3d 525 (8th Cir. 2010).

¶ 71    Even if a law enforcement agency's tolerance of multiple violations of its document retention policy does not constitute bad faith, however, I would hold that the repeated destruction of potentially exculpatory evidence as a consequence of this type of careless approach to document retention violates a defendant's due process rights.  Defendants have no control over the preservation of evidence in the hands of governmental agents.  Thus, it should not matter whether evidence was lost because an officer purposefully destroyed it, or whether the evidence was lost because the law enforcement agency conveyed the message to its personnel that they could take a cavalier approach to retention of evidence.  In these scenarios, either willful action or willful inaction resulted in the loss of the evidence.  This approach would be consistent with the Supreme Court's holding that a "conscious effort to suppress exculpatory evidence" can be deemed bad faith.  *See Trombetta*, 467 U.S. at 488.  A culture in which officers routinely disregard their agency's retention policy may reflect a "conscious effort to suppress exculpatory evidence."

¶ 72　　A law enforcement agency's repeated violation of its document retention policy can have significant consequences for a defendant's due process rights.  This is particularly true when the lost evidence was as potentially critical to the defense as the only recordings of witness statements obtained immediately following the alleged offense.  Treating lax enforcement of document retention policies as the equivalent of the bad faith destruction of evidence, if not bad faith itself, would create a more level playing field when defendants contend that the loss of potentially critical evidence violated their due process rights.

¶ 73　　First, it is not an easy task to prove bad faith.  Law enforcement officers have a disincentive to admit to their intentional destruction of evidence, particularly because the intentional destruction of evidence is sanctionable.  And, even if evidence is destroyed intentionally, the destruction of evidence is rarely documented on a video recording.  The task of proving the bad faith destruction of evidence is so difficult that I am unaware of any Colorado appellate decision holding that a law enforcement officer destroyed evidence in bad faith.  While the vast majority of officers

38

in Colorado would never think about engaging in such behavior, it would be naive to assume it has never occurred.

¶ 74    Second, absent proof of bad faith, a defendant attempting to prove a due process violation premised on a law enforcement officer's destruction of evidence faces an impossible task: proving that the evidence he or she never saw was exculpatory.

¶ 75    Of course, Eason did not establish that the deleted body camera recording was exculpatory.  How could he?  The Department deleted the video before he and his counsel could see it. The defense didn't know, the trial court didn't know, and we don't know what the victims and witnesses said on the destroyed video.

¶ 76    Nor could Eason assess whether the allegedly comparable evidence, most notably the deputy's one-page summary of the hour-long video, was comparable to the information on the video recording.  Eason had nothing to compare to the allegedly comparable evidence.

¶ 77    The Ohio Court of Appeals aptly described this conundrum:

> The state contends that even if its refusal to
> provide the videotape was noncompliant with
> [Ohio] Crim. R. 16, [the defendant] has still
> failed to show that he was prejudiced by the
> refusal — as he offers only speculation and

cannot demonstrate that the tape would have proven his innocence. After our initial bewilderment, we question whether the state is facetious in advancing this Alice-in-Wonderland argument. The tautology is too obvious: [T]he defendant has not justified his right to a copy of the videotape upon which he might experiment in search of exculpatory evidence because he has not already proven that the experiment would produce exculpatory evidence. . . . The repetitive and circular invective is dizzying.

Thus, we are reminded of Alice's tumble down the rabbit hole, and the point at which she observed the Knave of Hearts standing trial for theft of the Queen's tarts. . . . Accordingly, if [the defendant] cannot prove that he was not the driver of the car, then he has no right to demand evidence with which he might prove that he was not the driver. This is patently absurd.

*State v. South*, 2005-Ohio-2152, ¶¶ 13-14, 832 N.E.2d 1222, 1226-27.

¶ 78 But this is not the right case for deciding whether the destruction of potentially exculpatory evidence as a consequence of a law enforcement agency's conscious disregard of its document retention policy violates a defendant's right to due process. The record in this case does not reveal the circumstances of the destruction of the body camera videos in the two other cases.

40

Without such information, it is impossible for us to determine whether the employees of the Department consistently turn a blind eye to the Department's document retention policy. Accordingly, based on the record of the proceedings in the trial court, I agree with the majority that the Department did not destroy the body camera video recording in bad faith. Following our precedents, I also agree with the majority that the destruction of the recording did not violate Eason's due process rights.

¶ 79     But my agreement with my colleagues' conclusion does not mean that the majority opinion should be construed as condoning law enforcement officers' lackadaisical adherence to retention requirements. The courts will not tolerate a law enforcement agency's systemic failure to comply with its document retention policy or any other retention requirement imposed by law.